MISSOURI FARMERS ASSOCIATION, INC., a Missouri corporation, Plaintiff-Appellant,

v.

WOLFE BROTHERS FARM, INC., a Missouri corporation, and Charles M. Wolfe, Deborah A. Wolfe, Thomas Wolfe, Jane F. Wolfe, James W. Wolfe, Mabel A. Wolfe, Karl F. Wolfe and Linda Wolfe, Defendants-Respondents.

No. 13505.

Missouri Court of Appeals, Southern District, Division One.

Nov. 16, 1984.

Stanley Brian Cox, Sedalia, for plaintiff-appellant.

Janice P. Noland, Camdenton, for defendants-respondents.

PER CURIAM:

Plaintiff M.F.A. filed this action to recover from defendants amounts allegedly owed by the latter on an open account. The petition[1] charged that between March 1, 1977, and April 7, 1982, defendant Wolfe Bros. Farm, Inc., purchased from plaintiff and plaintiff sold and delivered to defendant Wolfe Bros. Farm, Inc., certain merchandise and farm supplies, feed, seed, and/or services, the "fair and reasonable value" of which totalled $65,238.25. In its fourth enumerated averment, plaintiff alleged the individual defendants signed a "Guarantee Agreement and Standard Retail Charge Agreement" on February 22, 1978, whereby they agreed to guarantee payment to plaintiff of any and all accounts of defendant Wolfe Bros. Farm, Inc. and to pay finance charges at certain specified rates.

At trial before a jury, it developed that the "Guarantee Agreement" and "Standard Retail Charge Agreement" were both embodied in a single form document in fact bearing neither of the alleged designations and to which was affixed a small piece of note paper containing signatures of the eight individual defendants. One portion of the main document was headed "Credit Application." Among the information requested therein was the desired amount of credit ("I hereby apply for credit in the amount of $_____") which had been completed to reflect $15,000.00. Another portion of the document was headed "Credit Agreement" and included various printed terms and conditions of the relationship between creditor and debtor. The first of these terms provided "Second Party guarantees payment to First Party of any and all loans, notes, accounts or advances made to or for the use, account or benefit of the

---

**1.** The petition was styled "Petition on Account and Retail Charge Agreement."

Second Party, whether evidenced by bills payable, open account, notes rediscounted," etc. The "Credit Agreement" also set forth terms regarding finance charges and the statement that "The Parties mutually agree that this is a continuing agreement, applying to all existing and future transactions between the parties until revoked in writing ...." Stapled to the Credit Application and Agreement was a 5″ × 5½″ sheet of note paper containing the signatures of all the individual defendants. Above these signatures appeared the typewritten words "ATTACHMENT" and "Personally Guaranteed By: ".

Allen Holley was manager of the Warsaw M.F.A. Exchange for the period during which Wolfe Bros. Farm, Inc. allegedly made the account purchases here in question. Mr. Holley testified that the exchange made out sales tickets for products it sold, whether delivered to or picked up by the customer. Both the exchange and the M.F.A. home office in Columbia retained copies of these tickets, which were prepared at the time of purchase. Admitted in evidence were numerous such tickets, made out to reflect purchases on account by Wolfe Bros. Farm, Inc. Most of these purchases were for "feed, probably fertilizer, seed and health products."

Mr. Holley also testified regarding the aforementioned Credit Application and Agreement. He stated that, "Since theirs was a corporation, all of the parties of the corporation had to sign. So I penciled in 'See Attachment' or 'Guaranteed By' and all of those there were to sign it ... it had to be guaranteed by all of the parties to the corporation." Mr. Holley later testified that the "it" that "had to be guaranteed" was an "agricultural loan" of $15,000.00 and that this loan was never made.[2]

Examination of the Credit Application and Agreement reveals that Mr. Holley "pencilled in" the words "Personally Guaranteed By" in a space near the bottom of its second page, within the "Agreement" portion of the document, and beneath this heading drew four lines on which the individual defendants were to place their signatures. After Thomas Wolfe signed on the first of these lines,[3] Mr. Holley apparently realized there would not be space enough for the signatures of all eight of the Wolfe family members. He consequently crossed out the "Personally Guaranteed By" heading and the four lines and wrote "See Attachment" above this space. However, Mr. Holley was not present when the eight individual defendants signed the small sheet of note paper now stapled to the Credit Application and Agreement.

William Bennett, retail credit manager for M.F.A. testified that his office sent a letter dated May 15, 1978, to Thomas Wolfe, president of Wolfe Bros. Farm, Inc., advising him that M.F.A. had "taken the liberty" of typing "Attachment" and "Personally Guaranteed By" on the above-mentioned sheet of note paper which the individual defendants had previously signed. The letter further stated, "Should this alter the purpose or intent of these signatures, please advise this office on or before May 22, 1978." Mr. Bennett testified that his

---

2. The following exchange took place on defendants' cross-examination of Mr. Holley:

"Q Let me ask you also—upon this agreement, what type of explanation did you make to Mr. Wolfe about it? Did you say it was an agricultural loan for $15,000?
A That is what we filled out, the credit application. That was the reason this one was filled out.
Q In other words you were going to give him a loan of $15,000, is that correct? A Yes."

This subject was further pursued on redirect:

"Q [F]or what purpose was this application filled out? A At that time their open account was so behind and if we could get an agricultural loan—

Q What is this? A This is a loan M.F.A. makes for a year for farm supplies, feeds and seeds.
Q Where do you have to buy those from—M.F.A.? If I wanted to go out and buy some from someone else they wouldn't loan me money to do it?
A No, they wouldn't.
Q Do you have to have an account with M.F.A. to obtain this loan? A Yes."

3. Thomas Wolfe also signed the underlying Credit Agreement, as president of Wolfe Bros. Farm, Inc.

office received no word from defendants concerning the announced addenda.

Mr. Bennett also testified as to the "agricultural loan" for which, according to Mr. Holley, the credit application had been made. He characterized it as "[a]n in-put loan where M.F.A. agrees to provide for a long-term, but financing for no longer—for one year for purchases made through the exchange. They have to be made at the exchange—it is necessary that there is an account prior to the [loan] coming in. The requirement therefore of the ... loan, there is a credit application. The credit application is good for the account that exists now. The account that will be."

In his May 15, 1978 letter to Thomas Wolfe, supra, Mr. Bennett expressed reluctance to extend the loan on previously agreed-upon security terms and proposed that Wolfe Bros. Farm, Inc. execute a new note in lieu of the original.[4] As it happened, no "loan" was ever made. However, Mr. Bennett testified that, while "[t]he loan was not finalized—we finalized a line of credit for the Wolfes at $15,000." Asked why no loan, as such, was made, Mr. Bennett stated, "They did not finalize the note that we had requested."

Also testifying was John Sanders, a credit investigator for M.F.A. in charge of handling delinquent accounts from the various M.F.A. exchanges. Through him were introduced into evidence statements of account reflecting all charges to and payments on the account of Wolfe Bros. Farm, Inc., from March, 1977, through August, 1983. These statements were said to constitute a record of all charges indicated on the sales tickets about which Mr. Holley testified. They were compiled on a monthly basis, each statement reflecting a cumulative balance owed as of the end of the particular month. Mr. Sanders testified that, as of April 7, 1982, the balance due on the account of Wolfe Bros. Farm, Inc., was $57,283.40 and that this figure included credit for all payments made through that date. Interest on this sum from April 7, 1982, to the trial date was said to have accumulated at "the rate that M.F.A. charges upon their open accounts" and totalled $8,472.42.[5]

Plaintiff also read into evidence excerpts from the depositions of the eight individual defendants. Each identified his or her own signature on the sheet of note paper marked "Attachment" and "Personally Guaranteed By." Thomas Wolfe testified that, as keeper of most of the books and records of the corporation, he would go over the monthly statements from M.F.A., taking note of the charges thereon before filing them. Mr. Wolfe could not recall ever complaining to M.F.A. regarding the accuracy or correctness of any of the statements sent from March, 1977, through September, 1983, though he did mention that he inquired about a certain credit M.F.A. had given Wolfe Bros. Farm, Inc., for grain that would not fit in the latter's bin, and that he once pointed out to M.F.A. a sales ticket he believed to be in error to the extent of $184.00. Mr. Wolfe stated that if there had been a complaint to be made, he, as president, would have been the one to make it. He also stated that, as of the

---

4. The letter read, "There was one other problem that should be worked out before the note can be approved. The security taken was 100 acres of corn and 50 acres of milo which, according to your cash flow projections, will be utilized as feed for the dairy herd. Because it appears there will be no grain sold to generate cash, the crops are of very little value as security. However, we do feel that we could proceed with your loan request if the note is rewritten to call for a $5000 payment on June 30, 1978, $5000 due September 1, 1978 and the balance due on December 1, 1978. We are returning the original $15,000 note to Allen Holley to be returned to you."

5. Mr. Sanders stated that this open account interest charge was at "the rate that is upon the credit application." While it nowhere appears that defendants, corporate or individual, signed a Credit Agreement in or prior to March, 1977 in order to commence their open account purchasing, the statements of account for the period from that date until execution on February 22, 1978, of the Credit Agreement here in question list rates identical to those specified in that agreement.

June, 1982, statement, Wolfe Bros. Farm, Inc., had made no payment not credited to its account.

At the close of plaintiff's case, defendants moved for a directed verdict on the ground, inter alia, that, as the credit application was for a loan that was never extended to Wolfe Bros. Farm, Inc., there was no consideration to support the Credit Agreement and it therefore could not stand as a basis for the instant suit. The trial court sustained the motion.

■■■■ While it is true that plaintiff purported to rely on the "Guarantee Agreement and Standard Retail Charge Agreement" referred to in its petition, the amount allegedly owed by Wolfe Bros. Farm, Inc., was for purchases made on an open account, proof of which purchases was amply supplied by statements of account. Thus, so far as concerns this account claim against the corporate defendant, plaintiff's reliance on the above-noted agreements was superfluous. That those agreements may not have been supported by consideration is irrelevant to the issue of whether Wolfe Bros. Farm, Inc., is indebted to plaintiff on its account. It was therefore improper for the trial court to grant a directed verdict as to plaintiff's claim against the corporate defendant on the ground that there was no consideration to support the credit agreement and guaranty. Albeit plaintiff itself ought rightly to bear the blame for the trial court's detour into and preoccupation with the irrelevant, we do not believe this circumstance warrants the extreme "sanction" of a directed verdict. The sustaining of a motion for directed verdict at the close of plaintiff's evidence is a drastic action which should only be done when all of the plaintiff's evidence and the reasonable inferences to be drawn therefrom are so strongly against plaintiff that there is no room for

reasonable minds to differ. *Mercer v. Thornton*, 646 S.W.2d 375, 376[2] (Mo.App. 1983); *Meeks v. Berkbuegler*, 632 S.W.2d 24, 26[1] (Mo.App.1982).

■■■■ In order to hold the individual defendants secondarily liable as guarantors of the corporate account obligation, it was fundamentally necessary for plaintiff to show that the purported guaranty applied to that obligation.[6] This plaintiff failed to do. It is clear from the evidence that the purported guaranty applied to whatever obligation was created by the Credit Agreement. Plaintiff's own witness, Allen Holley, testified that Thomas Wolfe, on behalf of Wolfe Bros. Farm, Inc., completed the Credit Application and signed the Credit Agreement in order to obtain an "agricultural loan" of $15,000.00. No such loan was ever made. The Credit Agreement therefore failed for want of consideration. As there was no showing that the purported guaranty was to be supported by consideration other than that supporting the principal contract, the guaranty must also be deemed to have failed, as a matter of law. A guaranty is a contract and, like all contracts, must be supported by consideration, either independent of or the same as that supporting the principal contract, provided in the latter case the guaranty is executed contemporaneously with the principal contract. *Mercantile Trust Co. v. Carp*, 648 S.W.2d 920, 923[5] (Mo.App.1983); *Bloom v. Calcaterra*, 600 S.W.2d 192, 195[2] (Mo. App.1980).

■■■■ We acknowledge that plaintiff's witness, William Bennett, testified that although no $15,000.00 loan was made, a "line of credit" for $15,000 was extended to Wolfe Bros. Farm, Inc. However, extension of a line of credit in lieu of the loan for which the Credit Application was completed was not shown to have been a substitution

---

6. "A guaranty in its technical and legal sense has relation to some other contract or obligation with reference to which it is a collateral undertaking; it is a secondary and not a primary obligation. A guaranty can exist only where there is some principal or substantive liability to which it is collateral; if there is no primary liability on the part of the third person, either express or implied, that is, if there is no debt, default, or miscarriage, present or prospective, there is nothing to guarantee and hence there can be no contract of guaranty." 38 C.J.S. Guaranty § 2, at p. 1130.

of consideration to which the individual defendants, as purported guarantors, consented. A guarantor will be released from his undertaking by any material alteration of the original obligation or duty to which the guaranty relates, unless he consents thereto. 38 C.J.S. Guaranty § 72a, p. 1233. We are of the opinion that the trial court did not err in directing a verdict against plaintiff on its guaranty claim against the individual defendants.

We reverse the trial court's direction of a verdict against the plaintiff on its account claim against the corporate defendant and remand for a new trial of that claim. We affirm the trial court's direction of a verdict against the plaintiff on its guaranty claim against the individual defendants.

All concur.