**Fred J. WIGLEY, Plaintiff–Respondent,**

v.

**CAPITAL BANK OF SOUTHWEST MISSOURI, Robert Hale King, and Majir Kornblit, Defendants–Appellants.**

Nos. 18913, 18916 and 18917.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 18, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 9, 1994.

Application to Transfer Denied
Dec. 20, 1994.

Brian Timothy Meyers, Gotschall and Meyers, Kansas City, James B. Condry, Lynn C. Rodgers, Hall, Ansley, Rodgers & Condry, Springfield, for plaintiff-respondent.

Jason M. Rugo, Patricia S. Williams, Gallop, Johnson & Neuman, L.C., St. Louis, Joe C. Greene, Benn K. Upp, Greene & Curtis, Springfield, for defendant-appellant Capital Bank of Southwest MO.

Kurt H. King, Liberty, for defendant-appellant Robert Hale King.

Richard E. Dorr, Dorr, Bair and Lightner, P.C., Springfield, for defendant-appellant Majir Kornblit.

PREWITT, Judge.

Plaintiff filed a four-count petition seeking damages from defendants. Count I alleged breach of contract against defendant Kornblit. Count II claimed defendant Capital Bank of Southwest Missouri (Capital Bank) tortiously interfered with plaintiff's agreement with defendant Kornblit, seeking actual and punitive damages for that interference.

Count III sought actual and punitive damages against defendant King, also for tortious interference of that contract. Count IV alleged that defendants conspired to interfere with the contract between plaintiff and defendant Kornblit, seeking actual and punitive damages against each defendant. Defendant Capital Bank counterclaimed, alleging that plaintiff had guaranteed a note of Crystal Cube Ice Co. for $399,762.33 which was unpaid.

Following jury trial, verdicts were returned in favor of plaintiff on Count I for $250,000; on Counts II and III, $850,000 actual damages, $500,000 punitive damages against Capital Bank and $1,100,000 punitive damages against defendant King; Count IV $3.00 actual damages, $100,000 punitive damages against defendant Capital Bank, $100,000 punitive damages against defendant King and $50,000 punitive damages against defendant Kornblit. A verdict was also returned denying Capital Bank's counterclaim. Judgment was entered in accordance with the verdicts. Each defendant appeals and the appeals have been consolidated.

On appeal the evidence and inferences therefrom are viewed in the light most favorable to plaintiff, as the prevailing party, and all contrary evidence is disregarded. *Community Title v. Roosevelt Federal S & L*, 796 S.W.2d 369, 371 (Mo. banc 1990).

Plaintiff developed a process for transporting ice in medium temperature trucks. This enabled ice to be distributed along with other grocery products through a warehouse, resulting in more versatile availability for businesses purchasing ice and lower costs of production and delivery.

Plaintiff enlisted defendant Kornblit for financial help in constructing a facility to produce ice using the process he had developed. In November 1987, the two secured a contract with Associated Wholesale Grocers to buy and warehouse ice. Additionally, plaintiff began to reach agreements with others to buy ice through the warehouse program. A business plan was submitted to Landmark Bank, who in January 1988 approved, with contingencies, a loan of $1.1 million.[1]

In May 1988 Crystal Cube was incorporated and plaintiff began to search for a location to build the ice facility. In the summer of 1988 Wigley met defendant King, who owned a building. King contributed the land and building, plus a promise to inject $150,000 cash, in exchange for ⅓ of the stock. Plaintiff granted the corporation a license to use his patented ice distribution process.

Plaintiff's claims arise from a "Stockholders' Agreement" entered into in August or September of 1988 by plaintiff, defendant Kornblit and Tom Sanford. The agreement recites that they are the incorporators of Crystal Cube Ice Company (Crystal Cube), a Missouri corporation. It states that the company intends to construct an ice plant in Springfield, Missouri and to finance the construction applied for a Small Business Administration (S.B.A.) loan of $450,000 and a conventional bank loan of $400,000. The bank loan was with defendant Capital Bank, although the agreement does not so state. Plaintiff and defendant Kornblit were to personally guarantee the loans.

Defendant King is not a party to the agreement, but it states that he agreed to convey certain land and buildings to the corporation subject to a mortgage of $77,500 plus pay $150,000 to Crystal Cube for one-third of its issued stock. The agreement says that the incorporators intend to issue 25,000,000 shares of stock. The remaining ⅔ of the stock is to be issued to defendant Kornblit. Kornblit agrees that when the indebtedness to the S.B.A. and the bank has been paid, "or at such time as he is released from the guaranty thereon, he will assign and transfer ... twenty-eight and one-third percent (28.333%—7,083,333 shares) to Fred Wigley."

In September, 1988 Landmark made a loan for $400,000 payable March 14, 1989. An additional $450,000 was loaned by Landmark by a 15 year note, 85% guaranteed by S.B.A. A first deed of trust on the land and

1. Landmark Bank was the name previously used by defendant Capital Bank of Southwest Missouri.

buildings was to secure the notes. S.B.A. was to have a second deed of trust. Although the buildings were on lots numbered 2 and 3, the bank's deed of trust only covered lot 3. The property the bank intended the deed of trust to cover was appraised in May 1989, with improvements, at $700,000. After learning of the mistake in the deed of trust, the bank considered the loan greatly undersecured. Additionally, the bank believed their S.B.A. guaranty to be in jeopardy, as a condition of the guaranty was a valid second deed of trust on all the property.

There were difficulties constructing the ice plant and with the operation of its equipment, and disagreements between plaintiff and defendants King and Kornblit. When the $400,000 note came due March 14, 1989, Kornblit refused to pay off the note or contribute any more money, and wanted off of his guarantee.

The bank pursued a plan where King replaced Kornblit as a guarantor. The S.B.A. required King to have $260,000 in assets before S.B.A. would agree to the release of Kornblit. King had a net worth of $300,000 with his ⅓ stock interest in Crystal Cube valued at $250,000, a valuation which the bank and S.B.A. accepted. Defendant King requested the bank not to release Wigley from his guaranty and King conditioned his participation in the plan on transfer of all the shares controlled by Kornblit to him. An agreement regarding this transfer was apparently put in writing on April 1, 1989 and was modified on May 8, 1989.

On May 31, 1989, defendant bank by its "Senior Vice President" executed a document which purported to release defendant Kornblit and his wife "from any and all obligations to pay any promissory notes or other evidences of indebtedness in connection with any debt incurred by Crystal Cube Ice Company" with the bank. Below the signature of the vice president the document recited, "The above release is contingent upon the 16,666,667 shares of CRYSTAL CUBE ICE COMPANY, INC. owned by Majir Kornblit

being assigned and transferred to R. Hale King and Donna J. King."

In June 1989, King signed on behalf of Crystal Cube an extension of the note due March 14, 1989. The bank "back notarized" the document making it appear to have been signed March 14 when the original note came due. Kornblit was released from his guaranty of the note, while Wigley was not.

On November 29, 1989 the bank made Crystal Cube an additional loan of $100,000 to receive a corrected deed of trust. The loan officer testified he did not expect the bank to receive payment. He said, "I needed that piece of land." The note was almost immediately charged off. Other facts are mentioned later in discussing the parties' contentions here.

Plaintiff submitted the breach of contract claim against defendant Kornblit, by an instruction requesting the jury to find if Kornblit breached the contract by not transferring 28.333% of the shares of Crystal Cube Ice Company to plaintiff "at such times as he [Kornblit] was released from the guaranty on the promissory note totalling $850,000.00".

Plaintiff's claim against defendant bank was submitted based upon it causing Kornblit to breach the contract with plaintiff "intentionally and without justification or excuse". The submission against King for tortious interference was on the same basis as the claim against the bank. The conspiracy claim was submitted by an instruction asking the jury to find if defendants "agreed that the bank would require conveyance [?] of all of the shares of stock in Crystal Cube Ice Company, Inc., in the possession of defendant Majir Kornblit to defendant Robert Hale King as a condition of release of defendant Majir Kornblit from the guaranties referred to in evidence, in order to deprive Fred Wigley of those shares".[2]

▮ We first discuss plaintiff's motion to dismiss the appeal of defendant King. That motion is premised on King's after-trial motion being untimely filed. Ordinarily, Friday, May 7, 1993 would have been the last

---

2. We inserted the [?] after "conveyance", as when used in the transfer of property that term is ordinarily limited to the transfer of an interest in real property. BLACK'S LAW DICTIONARY 333 (6th ed. 1990). No question about its use in the instruction was raised here.

day for filing such a motion. The motion was filed on Monday, May 10, 1993. The circuit clerk's office was closed on Friday, May 7, 1993 in observation of the birthday of Harry Truman. Section 9.010, RSMo 1986, makes May 8 a public holiday. Administrative Rule 7.01.c.2.2(a) of the Missouri Supreme Court states that in "the event that a state holiday falls on a Saturday, such holiday shall be observed on the preceding Friday."

Rule 44.01(a) provides that when the last day of a period for filing is a Saturday, Sunday or legal holiday, the period runs until "the end of the next day which is neither a Saturday, Sunday nor a legal holiday." In accordance with the administrative rule, we conclude that Friday, May 7, 1993 was a legal holiday within the meaning of Rule 44.01(a) and King's after-trial motion was timely filed. The motion to dismiss King's appeal is denied.

■ We next discuss whether a submissible case was made against the bank and King on the theory of tortious interference with a contract or business relationship. Such a claim requires proof of: (1) a contract or valid business relationship or expectancy; (2) knowledge by defendant of the contract or relationship; (3) intentional interference by the defendant inducing or causing the breach of contract or interference with the business relationship; (4) absence of justification; and (5) damages as a result thereof. *Community Title,* 796 S.W.2d at 372; *Murray v. Ray,* 862 S.W.2d 931, 934 (Mo.App.1993).

■ The bank and King each argue that plaintiff failed to make a case against them on the "absence of justification" element. Each claims to have been acting to protect a "present existing economic interest." Plaintiff had the burden of producing substantial evidence to establish the absence of justification. *Community Title* at 372. There is no improper interference when a defendant has a legitimate economic interest and employs no "improper means". *Id.* Shareholders have an interest in the business of the corporation in which they own stock. *Murray,* 862 S.W.2d at 935; *Green v. Beagle–Chilcutt Painting Co.,* 726 S.W.2d 344, 351 (Mo.App. 1987) (majority shareholder has an interest in the economic soundness of the business).

As a holder of one-third of the shares of Crystal Cube, King had a present existing economic interest. Although we have not been cited to or located any cases directly addressing the issue in Missouri, it also is apparent that a major creditor of a company has an economic interest in the company. *See Nitzberg v. Zalesky,* 370 So.2d 389, 392 (Fla.App.1979), overruled on other grounds in *Ethyl Corp. v. Balter,* 386 So.2d 1220, 1226 (Fla.App. 3rd Dist.1980).

■ The question remains whether the actions of King and the bank were taken to protect those interests. The parties disagree about the exact financial situation of Crystal Cube at the time Kornblit transferred his stock to King. However, the evidence is uncontroverted that when payments on the notes were due, Kornblit, who controlled two-thirds of the shares of the company, had expressed an unwillingness to participate further.

Plaintiff argues that in acquiring the remaining shares held by Kornblit, King was acting to gain new interests, more shares in the company, rather than acting to protect his existing interest. Although the value of King's original shares might have been protected by King gaining a controlling interest in the corporation, plaintiff argues that this could have been accomplished without the shares covered by plaintiff's and Kornblit's agreement. Plaintiff further argues that other restructuring plans were available to which he was agreeable.

These contentions of plaintiff are unpersuasive. A defendant is entitled to use his business judgment in protecting an existing interest. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 986 (5th ed. 1984). The soundness of that business judgment is irrelevant. *Murray,* 862 S.W.2d at 935; *Green,* 726 S.W.2d at 351.

Plaintiff argues that the bank saw King as the only one who could deliver sufficient security for its notes, and that Capital Bank followed a course of appeasing King to that end. Although the bank denied any knowledge of the problem with its security until August 1989, the evidence was sufficient for the jury to find the bank knew of the prob-

lem by May 22, 1989. Plaintiff argues that in seeking that security, the bank sought a new economic interest, beyond that presently in existence at the time of the alleged interference.

■ The cases do not discuss whether improper means must be shown in cases of mixed motive where the defendant acts at least partly with the purpose of protecting a present existing economic interest. Discerning the "motive" of a defendant from his actions in such a matter as this is difficult, if not impossible. *Community Title* indicates that if the alleged interference by defendant is in substantial part motivated to protect a present existing economic interest, then a showing of improper means is required. *See* 796 S.W.2d at 372.

The ownership structure of Crystal Cube, prior to the transfer of stock from Kornblit to King resulted in conflicts between the parties and threatened all the parties with an existing interest in the company. Even when viewed in the light most favorable to plaintiff, the evidence established that the actions of King and Capital Bank were at least partly motivated to protect their existing interests in Crystal Cube. Therefore, "improper means" must be shown.

■ The "improper means" rule found in Missouri law strikes a balance, allowing recovery in those situations where a plaintiff is harmed by wrongful conduct, without unduly hindering the ability of defendants to protect their existing economic interests. "Improper means, for purposes of intentional interference with contractual relations or business expectancy, are those means which are independently wrongful, notwithstanding injury caused by the interference." *Community Title*, 796 S.W.2d at 373.[3]

The extent of the argument in plaintiff's brief on the employment of wrongful means by King is as follows:

"The King interference is fraudulent on its face. (Ex. 65). King acknowledges

fraud is improper means. *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 317 (Mo. banc 1993). King would probably acknowledge forging notaries is an unlawful act." [4]

■ As to the bank, the only specific wrongful act that Wigley points to is the "back-notarizing" of the extension of the note binding Wigley. The evidence was sufficient for the jury to find that the bank through its employee intentionally back-dated it. However, this was done in June of 1989, after Kornblit had been released and he and King had made an agreement to transfer Kornblit's stock.

Plaintiff argues the misdating was "part and parcel" of the interference. The argument falls short. The requirement is not met by "the presence in the air of some 'wrongful means'." *Henry v. Chloride, Inc.,* 809 F.2d 1334, 1352 (8th Cir.1987). The Court in *Community Title* stated, "It is not justification to knowingly procure the breach of a contract where the defendant ... in doing so employs improper means." *Id.* at 372. The improper means must be a part of what procures the breach. Here, whether or not the execution of the loan extension was proper, it had nothing to do with inducing Kornblit to breach his agreement with Wigley. It had already been breached.

Plaintiff failed to make a case of tortious interference, either as to King or as to the Capital Bank, in that he failed to show absence of justification on the part of either defendant. Counts II and III were not proven and should not have been submitted to the jury. As the bank and King were justified in their actions, they were not subjected to liability as stated in Count IV and that count should not have been submitted against them.

■ Besides claiming against Capital Bank and King, Count IV also alleged that defendant Kornblit conspired to interfere

---

**3.** Some have suggested there should be an "independently unlawful act" in every tortious interference case. *See* Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine,* 49 U.Chi.L.Rev. 61 (1982).

**4.** Exhibit 65 is the bank's release of Kornblit from his personal guaranty.

with the contract between plaintiff and him. Kornblit argues that a party to a contract can not be charged with conspiracy to tortiously interfere with that contract.

Cases state that a party to a contract cannot tortiously interfere with his own contract. *White v. Land Clearance for Redevelopment Authority,* 841 S.W.2d 691, 695 (Mo. App.1992); *Franklin v. Harris,* 762 S.W.2d 847, 849 (Mo.App.1989). As Kornblit, Capital Bank and King were not liable on a conspiracy to tortiously interfere theory, Count IV should not have been submitted to the jury.[5]

■ Defendant Kornblit complains of the submission of the separate damage instructions under the contract, tortious interference, and conspiracy claims. He asserts they confused the jury and gave it a "roving commission". He preserved this contention by properly raising the issue in his motion for judgment notwithstanding the verdict or new trial.[6]

"Roving commission" as used in the cases relied on by Kornblit refers to situations where the instructions failed to submit the ultimate facts necessary for the jury to find, *see Todd v. Watson,* 501 S.W.2d 48, 50 (Mo. 1973), or failed to guide the jury on the meaning of an element, *see Moore v. Quality Dairy Co.,* 425 S.W.2d 261, 266 (Mo.App. 1968). Here, the damage instruction on the contract claim was specific, limiting damages to the value of the stock. It read:

"If you find in favor of the Plaintiff, then you must award Plaintiff such sum as you may find to be the actual value of 28.333% of shares of stock of Crystal Cube Ice Company, Inc., as of May 31, 1989."

Reversal based on instructional error requires prejudice.

*Lee v. Mirbaha,* 722 S.W.2d 80, 81 (Mo. banc 1986). Defendant Kornblit has not established how the damage instruction, given on the only count of plaintiff's petition properly submitted, confused the jury or prejudiced him.

Kornblit asserts that plaintiff was allowed multiple recovery because the various damage instructions covered at least in part the same injury. He further argues under Point I and in Point V that to the extent of the contract damages, liability should be joint and several with the tort defendants. In Points II, III and IV, Kornblit claims error in the submission of the conspiracy instruction against him and the punitive damage instruction based on plaintiff's conspiracy claim. These contentions are now moot due to the resolution previously discussed, of the points presented by Kornblit, King and Capital Bank pertaining to tortious interference and conspiracy.

■ In his fifth point, Kornblit argues there was no "credible evidence as to the value of respondent's claimed portion of the stock", and that "Verdict A was against the weight of the evidence in that there was no breach of contract as a matter of law." Kornblit contends that plaintiff was allowed to testify as to his opinion of the value of the stock without being qualified as an expert or a "quasi owner". Wigley testified the stock was worth between $250,000 and $350,000.

Generally, owners of property are qualified to testify as to its value on the rationale that an owner has particular familiarity with the property so that his opinion will be sufficiently reliable to be admissible. *St. Joseph Light v. Kaw Valley Tunneling,* 589 S.W.2d 260, 269 (Mo. banc 1979). Even if plaintiff was not an owner, he had sufficient familiarity with the company to make his opinion as to the value admissible.

Furthermore, there was other evidence consistent with plaintiff's testimony for the jury to consider in valuing the stock at $250,-

---

**5.** There is authority that a party to a contract can be "liable for conspiring with third parties to breach his own contract." *Lick Creek Sewer Sys. v. Bank of Bourbon,* 747 S.W.2d 317, 323 (Mo. App.1988). *See also Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co.,* 403 S.W.2d 922, 926 (Mo.App.1966); 15A C.J.S., Conspiracy § 13 (1967). *But See White,* 841 at 695. Conspiracy to breach was not a theory here claimed or submitted. Count IV was based on conspiracy to tortiously interfere with the agreement.

**6.** Rule 70.03, amended 6/1/93, effective 1/1/94, requires objection to instruction considered erroneous and inclusion of the issue in the motion for new trial. However, Rule 70.03 as it read at the time of trial required only that the issue be raised in the motion for new trial.

000. The evidence indicated that both the bank and the S.B.A. accepted a $250,000 valuation of the ⅙ interest held by King just prior to the release of defendant Kornblit. Whether such evidence should have been admitted is not a question presented.

■ Defendant Kornblit also contends that the evidence did not establish a breach of contract. He says "[t]he agreement between Wigley and Kornblit did not have any provisions which prohibited the assignment of rights or duties to third persons" and that he "had every reason to believe he had protected Wigley's interest in the stock since he had included specific language in his agreement with King which required King to acknowledge this obligation" [7].

Although Kornblit may be correct in asserting that he had a right to assign the stock to King, absent an agreement to the contrary, the delegation to King did not absolve him from his duty to transfer the stock. *See Missouri Pacific R. Co. v. Rental Storage & T. Co.*, 524 S.W.2d 898, 906 (Mo.App. 1975); *Leckie v. Bennett*, 160 Mo.App. 145, 141 S.W. 706, 710 (1911); RESTATEMENT OF CONTRACTS § 160(4) at 197 (1932); RESTATEMENT OF CONTRACTS (SECOND) § 318(3) at 19 (1979); 3 WILLISTON ON CONTRACTS § 411 at 18 (3d ed. 1960); 4 CORBIN ON CONTRACTS § 866 at 452 (1951). Plaintiff was entitled to look to Kornblit for performance once the condition occurred entitling him to the stock.

Defendant Kornblit further asserts Wigley refused to continue to work in the business unless he received additional royalties, and this was a breach of their agreement, resulting in "no obligation for anyone to issue stock to him". The agreement between plaintiff, defendant Kornblit and Sanford contains no language indicating that work by Wigley was a condition to his receiving the stock. The relevant provision states:

"Kornblit agrees that at such time as the two notes set out above have been paid in full or at such time as he is released from the guaranty thereon, he will assign and

transfer ... twenty-eight and one-third percent (28.333%—7,083,333 shares) to Fred Wigley."

As an officer, director and stockholder it appears Wigley intended to and was expected to work in and for the corporation. However, it was not established that his continuing to work was a condition to receiving the stock.

Kornblit's final point asserts that counsel for Wigley made various improper comments and during jury arguments. Kornblit contends that there were misstatements of the law regarding Wigley's liability on his guaranty, improper questioning of the collectibility of the verdict against King or Kornblit, and improper comments on failure to produce evidence.

"Determining the prejudicial effect of final argument is a matter within the discretion of the trial court, and the trial court's judgment on that matter will not be disturbed unless there was an abuse of discretion." *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d 426, 434 (Mo. banc 1985). *See also Tucker v. Kansas City Southern Ry. Co.*, 765 S.W.2d 308, 310 (Mo.App.1988).

■ "In closing argument, counsel is afforded wide latitude to suggest inferences from the evidence, and the trial court similarly has broad discretion to determine if the particular line of argument is proper." *Robertson v. Cameron Mut. Ins. Co.*, 855 S.W.2d 442, 447 (Mo.App.1993). The trial court is in a better position than the appellate court to appraise the consequence of a closing argument. *Id.* The comments do not appear to have been prejudicial to defendant Kornblit, particularly on the breach of contract claim. Whether they were prejudicial on the other counts is moot. There was no material error requiring reversal. *See* Rule 84.13(b).

■ The remaining point is the contention of Capital Bank that the "trial court erred in failing to direct a verdict, or grant judgment notwithstanding the verdict or a new trial in favor of the bank on its counterclaim against Wigley for liability on his guar-

---

**7.** A "Stock Sale Modification Agreement" dated May 8, 1989 between Kornblit and King provided:

"5. King acknowledges that he is familiar with the terms of the Stockholders' Agreement between Kornblit, Wigley and Sanford, and as additional consideration for this Agreement, agrees to hold Kornblit harmless from any claim which might be made against Kornblit by Wigley and Sanford."

anty, in that the bank made a submissible case on such liability to which Wigley interposed no legally effective defense." A party is entitled to a directed verdict only when its claim is established as a matter of law with no factual questions remaining for the jury to determine and the opposing party fails to establish any affirmative defense. *Utley Lumber v. Bank of the Bootheel,* 810 S.W.2d 610, 611 (Mo.App.1991).

Wigley's defense was based upon the bank entering into a loan extension agreement in June of 1989 which extended the maturity date and lowered the interest rate. Capital Bank countered that he had agreed to this by the provision in the guaranty which consented for the bank "to give and make such extensions, renewals, indulgences, settlements and compromises as it may deem proper".

Numerous cases set forth the principles that a guarantor is entitled to strict construction of the guaranty; a material alteration of the obligation guaranteed without the guarantor's consent will discharge the guarantor; if a change enlarges or lessens the liability, it is material and discharges the guarantor; and courts do not inquire whether the alteration was injurious or beneficial. *See Fuhrer v. Sheahan,* 857 S.W.2d 439, 441 (Mo.App.1993); *Kirkland v. Todd,* 856 S.W.2d 936, 939 (Mo.App.1993); *Lemay Bank & Trust Co. v. Lawrence,* 710 S.W.2d 318, 322 (Mo.App.1986); *Citizens Bank of Smithville v. Lair,* 687 S.W.2d 268, 270 (Mo.App.1985). *See also Golden Sun Feeds v. Dugan,* 682 S.W.2d 173, 176 (Mo.App.1984); *Missouri Farmers Ass'n v. Wolfe Bros. Farm,* 681 S.W.2d 15, 20 (Mo.App.1984); *First State Bank v. Benson,* 613 S.W.2d 888 (Mo.App.1981).

A change in the interest rate, whether an increase or decrease, is a material alteration discharging the guarantor unless consented to. *Citizens Bank,* 687 S.W.2d at 270. The bank acknowledged that the extension lowered the interest rate and Wigley did not consent to the modification except by the portion of the guaranty quoted above. The bank asserts that this language from the guaranty agreement was sufficient.

Strict construction of the guaranty does not support the bank's contention that plaintiff consented to a change in the interest rate. In *Citizens Bank,* the court found that a guarantor had not consented to a change in the interest rate where there was similar broad language, and the guaranty was voided. Here, as in *Citizens,* the terms "do not specifically mention" the effect of a change in interest rates on the guarantor's liability. 687 S.W.2d at 271.

The trial court was correct in denying the bank's motion for directed verdict and motion for judgment notwithstanding the verdict. No new trial was warranted on this basis as the instruction submitted for the jury was based on the evidence and is not otherwise under attack. The bank's contentions on the counterclaim are denied.

The portion of the judgment in favor of plaintiff on Count I against defendant Kornblit and the portion of the judgment in favor of plaintiff on defendant Capital Bank's counterclaim is affirmed. The portion of the judgment in favor of plaintiff on Counts II, III, and IV is reversed and the cause is remanded to the trial court to enter judgment in favor of defendants on Counts II, III and IV. In all other respects the judgment is affirmed.

FLANIGAN, P.J., and CROW, J., concur.