**Roy BIRDSONG and Collyer Kelling, Plaintiffs/Appellants/Cross–Respondents,**

**v.**

**Bobbi BYDALEK, Hch Ozark Investors, Inc., Daniel C. Ruda, Santo M. Catanese, Vacation World, Inc., Dwight Sprague, and Branson Commercial Property Investors Joint Venture, Defendants/Respondents/Cross–Appellants.**

**Nos. 21369, 21376 and 21390.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 22, 1997.

Motion for Rehearing or Transfer Denied Sept. 15, 1997.

Application to Transfer Denied Oct. 21, 1997.

Richard E. Dorr, J. Michael Bridges, Blackwell, Sanders, Matheny, Weary & Lombardi, LC, Springfield, for Appellants.

Craig A. Smith, Daniel, Clampett, Powell & Cunningham, Springfield, for Respondent/Cross–Appellant Bobbi Bydalek.

Charles B. Cowherd, Bryan O. Wade, Husch & Eppenberger, Springfield, for BCPI (HCH Ozark Investors, et al.)

SHRUM, Judge.

This case is about three tracts of land and some contracts pertaining to them. There are nine litigants, all of whom appeal. On April 16, 1993, HCH Ozark Investors, Inc. (HCH) and Bobbi Bydalek (Bydalek) signed a real estate purchase agreement. This document set forth the terms by which Bydalek was to purchase two tracts of land (29.03 acres and 3.84 acres) at Branson, Missouri, for $2,250,000. An abridged copy containing provisions pertinent to these appeals is attached to this opinion as "Document I."

Another tract, Lot 6 that adjoined the 29.03 acres and the 3.84 acres, was deemed critical to the development of this land. Around May 10, 1993, counsel for HCH notified counsel for Bydalek that HCH was negotiating to buy Lot 6. Counsel thereafter commenced drafting an agreement whereby HCH would sell Lot 6 to Bydalek.

On May 10, 1993, Bydalek contacted Roy Birdsong (Birdsong). According to Birdsong, Bydalek "was looking for potential investors to get involved" in the transactions described above. Birdsong understood Bydalek needed $100,000 for "her next payment" which was "due pretty quick."

On May 12, 1993, HCH assigned the Bydalek/Seller contracts to Branson Commercial Property Investors Joint Venture (BCPI). BCPI is a joint venture consisting of HCH, Vacation World, Inc. (Vacation World), and Dwight Sprague (Sprague).

Meanwhile, after Bydalek's visit, Birdsong informed Collyer Kelling (Kelling) about his conversation with Bydalek. Birdsong scheduled a meeting for 5:00 p.m., Thursday, May 13, 1993, at his office. Four people attended: Birdsong, Bydalek, Kelling and lawyer Ralph Hunt (Hunt) (at Kelling's request). During the meeting, Bydalek disclosed a $100,000 payment "was due the next day." The quartet discussed terms under which Birdsong and Kelling would participate in the project, including supplying the $100,000 for the upcoming payment.

The next day, May 14, the quartet met again at the office of Bydalek's lawyer, Larry Bratvold (Bratvold). Further negotiations resulted in a document titled Assignment of Real Estate Purchase Agreement and Agreement for Joint Venture. Bydalek, Birdsong and Kelling signed it that date. An abridged copy containing the provisions pertinent to these appeals is attached to this opinion as "Document II." That same day, Birdsong and Kelling arranged to obtain $50,000 each from State Bank of Southwest Missouri for the $100,000 payment.

On Sunday, May 16, 1993, Birdsong, Kelling and Bydalek met in Branson. Bydalek agreed to obtain an appraisal of the property. She also agreed to call a realtor, Jan James (James). Bydalek explained at trial, "[T]he object of contacting Jan James was to help with the financing because she had someone that was going to put in a mall, and if we could get up the appraisal high enough and the listing agreement high enough, that would help with the financing." Although James sent a proposed listing agreement to Bydalek on May 19, it was never signed by Bydalek.

By May 19 Bydalek had signed Addendum to Real Estate Purchase Agreement by which she agreed to buy the adjoining Lot 6 for $375,000. The Addendum was also signed by Santo Catanese on behalf of HCH, and by Catanese and Daniel C. Ruda (Ruda) on behalf of BCPI.

Bydalek contacted Swan Evaluation Group, a real estate appraisal firm, and scheduled a meeting with Hayden Harrison of that firm for May 19. The meeting with appraiser Harrison took place as scheduled. Bydalek asked Harrison to appraise the 29.03 acres and Lot 6. She told him the 3.84 acres were also "under contract," but were not to be appraised. Additionally, she cautioned him "not to speak to anybody about the appraisal," particularly Birdsong and Kelling.

On May 24, 1993, Bydalek sent Birdsong and Kelling a letter stating that all parties seemed "to be uneasy and uncomfortable" with each other and suggested "there should be no deal." She declared she would try to get financing on her own financial strength and would pay Birdsong and Kelling back $150,000 at closing.

As of June 11, an additional $50,000 earnest money payment was due under the By-

dalek/Seller contracts (*see* Document I). Faced with this deadline, Birdsong and Kelling, together with Bydalek, signed an agreement. This agreement declared that, despite the parties' conflicting views about the viability of the Bydalek/Plaintiff contract (*see* Document II), each was putting in another $16,666 so that the June 11 payment could be met. That same day, Birdsong wrote a $16,666 check, Kelling wrote a $16,666 check, and Bydalek wrote a $16,668 check to pay the amount due.

Bydalek signed two other documents on June 11. Both concerned deals she had made with BCPI. One document was an "escrow agreement" that directed the escrow agent to release all earnest money to BCPI before closing. Such release was to occur when the escrow agent received warranty deeds signed by all BCPI parties conveying the subject property to Bydalek. Exactly when and why Bydalek and BCPI first discussed this agreement was unclear from the record. The other deal between Bydalek and BCPI on June 11, 1993, was an "extension agreement." It provided that Bydalek could extend the date for closing to August 9, 1993, by paying an extra $100,000 for the property. Under this agreement the extra $100,000 had to be paid by July 9, 1993.

Bydalek insisted at trial that the escrow deal was negotiated before the extension agreement, that the two contracts were not connected, and the fact that both were signed the same date was merely a coincidence. Bydalek admitted, however, that she told neither Birdsong nor Kelling about either of these agreements. However, Bratvold sent details about the escrow agreement to Hunt on May 28, 1993. In that communication to Hunt, Bratvold stated: "If you have some input for me on it, please fax or call." Bratvold did not recall whether he got "input" or objection from Hunt about the proposed escrow agreement. Hunt testified that he told Bratvold that he saw no basis for early release of escrow funds, yet there is no evidence that Hunt ever instructed Bratvold that Bydalek should not agree to these terms.

As reported earlier, Birdsong and Kelling borrowed $100,000, in the aggregate, from State Bank of Southwest Missouri, to make the initial payment required of them under the Bydalek/Plaintiff contract. In arranging that loan, Birdsong informed Roger Terrill, senior vice-president of State Bank, about the project with Bydalek and asked about obtaining additional financing for it. Terrill informed Birdsong that the bank would require "two years tax returns, current financial statements and an overall scope of what the project was going to be. . . ." Such documentation would be required "on all the principals involved." On June 23, 1993, Terrill sent Birdsong a letter reminding him of the documentation required by the bank to consider financing the project. By that time, lawyer Andy Dalton had replaced Bratvold as counsel for Bydalek.

The next day (June 24), Hunt informed Dalton that Birdsong and Kelling were ready to "do the financing," but must have the appraisal, financial statement, and tax returns from Bydalek.

The Swan Evaluation Group completed the appraisal of the 29.03 acres and Lot 6 about June 24, 1993. A copy of the appraisal was delivered to Dalton on June 28. He sent Hunt a copy the next day.

On July 1, 1993, Hunt notified Dalton that Birdsong and Kelling were able to obtain the financing but had been unable to proceed because Bydalek did not provide the appraisal until June 29 and it did not cover the 3.84 acres. Furthermore, said Hunt, Bydalek never provided a financial statement or tax returns. Hunt concluded Bydalek deliberately made it impossible for his clients to obtain financing.

On July 6, 1993, banker Terrill sent Birdsong and Kelling a letter stating that even if the bank received a complete financial package on the project that day it would be impossible to act by the proposed closing date of July 9.

Meanwhile, Birdsong and Kelling had retained new counsel, Bowlin & Johns, P.C. On July 6, Bowlin sent Dalton a letter complaining about Bydalek and demanding the documentation necessary to obtain financing. Bowlin also sent a letter that date to BCPI's

lawyer, Debra Mallonee Shantz (Shantz), regarding the closing scheduled for July 9.[1]

On July 8, 1993, Birdsong and Kelling signed and filed in the Taney County Recorder's office a document entitled "Memorandum of Assignment of Real Estate Purchase Agreement and Agreement for Joint Venture." This document, which we refer to as "Assignment Memo," was an abbreviated version of the Bydalek/Plaintiff contract. The Assignment Memo contained only the language whereby Bydalek assigned two-thirds interest in her contracts to Plaintiffs.

The next day (July 9), Birdsong and Kelling (Plaintiffs) filed a petition against Bydalek, HCH, Ruda and Catanese. Simultaneously, Plaintiffs filed a "Notice of Lis Pendens" with the Taney County Recorder which described the 29.03 acres and the 3.84 acres, but not Lot 6.[2] That same day, Plaintiffs filed an amended petition. Plaintiffs attached to this first amended petition an unabridged copy of the Bydalek/Plaintiff contract.

Also on July 9, Bydalek paid BCPI the $100,000 called for by their June 11 "extension agreement," thereby receiving an extension of the closing date to August 9, 1993.

The pleadings on which the case was tried are identified and summarized below.

A. An eight-count Second Amended Petition by Plaintiffs.

Count I sought a declaration of the rights of all nine parties, together with actual damages and attorney fees from all seven defendants.[3]

Count II, labeled "breach of contract," was against all defendants except Bydalek and sought specific performance of the Bydalek/Seller contracts, together with actual damages and attorney fees.

Count III, also labeled "breach of contract," was against Bydalek and sought specific performance of the Bydalek/Plaintiff contract, together with actual damages and attorney fees.

Count IV, labeled "breach of fiduciary duty," was against Bydalek and sought actual and punitive damages, together with attorney fees.

Count V, labeled "tortious interference with contract and business expectancies," was against all defendants and sought specific performance, actual and exemplary damages, and attorney fees.

Count VI, labeled "civil conspiracy," was against all defendants and sought the same relief as Count V.

Count VII, labeled "fraudulent misrepresentation," was against Bydalek and sought actual and exemplary damages.

Count VIII, labeled "negligent misrepresentation," was against Bydalek and sought actual damages.

B. A three-count Second Amended Crossclaim and Counterclaim of HCH, Vacation World, Sprague and BCPI. Collectively, we refer to these four defendants as "Seller" in this opinion.

Count I sought a declaration that any interest of Plaintiffs in the three tracts was "ineffective," that the Bydalek/Plaintiff contract was "terminated," that all funds paid to Seller were Seller's sole property, that Plaintiffs be ordered to release "all lis pendens," and that Plaintiffs and Bydalek be ordered to pay the Seller's attorney fees.

Count II was against Plaintiffs but not Bydalek. It pled that Plaintiffs, by recording the Assignment Memo, interfered with the closing between Seller and Bydalek. Count II sought actual and exemplary damages.

Count III was also against Plaintiffs but not Bydalek. It averred Plaintiffs' filing of the Assignment Memo "was slanderous to

---

1. As we have seen, the extension agreement provided the closing date would be prolonged to August 9, 1993, upon payment of $100,000 by Bydalek to BCPI by July 9, 1993. Obviously, Bowlin and his clients were unaware of the extension contract.

2. On July 13, 1993, and again on August 6, 1993, Plaintiffs recorded amended notices of lis pendens in the office of the Taney County Recorder.

3. The Second Amended Petition added Vacation World, Sprague and BCPI as defendants.

the title" of Seller. Count III sought actual and punitive damages.

C. A one-count Cross–Claim of Bydalek against the other six defendants. It pled those defendants breached their contractual duty to supply Bydalek a title commitment showing Seller to be "the owner of good and marketable fee simple title to the property." The cross-claim sought specific performance, compensatory damages and attorney fees.

D. A one-count Counterclaim by Bydalek against Plaintiffs. It averred Plaintiffs failed to provide financing as promised in the Bydalek/Plaintiff contract, that Plaintiffs consequently had no expectancy to acquire any interest in the three tracts, that Plaintiffs interfered with Bydalek's "business relationships" by "filing multiple lis pendens," that Plaintiffs interfered with Bydalek's performance under the Bydalek/Seller contracts, and that Plaintiffs interfered with Seller's performance of its obligations to Bydalek. The counterclaim sought actual damages, exemplary damages and attorney fees.

At trial, Bydalek testified she had investors willing to provide her sufficient funds to close the purchase of the three tracts on August 9, 1993; however, the closing was prevented by the "cloud on the title" created when Plaintiffs filed notices of lis pendens and the Assignment Memo. Bydalek further testified she was again ready to close on August 24, 1993, but was again thwarted by the lis pendens and the Assignment Memo.

Following a five-day bench trial, the trial court filed a judgment on May 31, 1994. Among its many findings, the trial court concluded that Bydalek "was ready, willing and able to close the purchase . . . on August 9, 1993 and on August 24, 1993, had [Plaintiffs] not created title encumbrances before said dates and left such encumbrances on file."

Plaintiffs and Bydalek appealed from the May 31, 1994, judgment. In *Birdsong v. Bydalek*, 905 S.W.2d 896 (Mo.App.1995), this court dismissed the appeals because the judgment failed to resolve all the claims. We henceforth refer to that decision as *"Birdsong I."*

After this court's mandate in *Birdsong I,* the trial court held a hearing on October 26, 1995. At the hearing, Seller dismissed Count III of its second amended cross-claim and counterclaim.

Based on evidence presented at the hearing, the trial court found that on September 12, 1994, Seller conveyed the three tracts to Bydalek, and that she then conveyed the tracts to William L. Gehrs, Jr., Bette Jo Gehrs, James P. Brines, and Joyce L. Brines.

The trial court further found that at the September 12, 1994, closing, Bydalek paid BCPI $177,834.32 pursuant to the 1994 judgment.[4] The trial court stated: "Said sum represents damages to [Seller] and Bydalek arising from the delay in closing the sale of the real estate. . . . [Said] $177,834.32 represented part of the attorney's fees incurred by [Seller] in this litigation and interest expenses incurred by . . . [Seller] from August 8, 1993 through the date of closing."

The trial court further found that at the September 12, 1994, closing, Bydalek paid from the proceeds due her from the Gehrs and Brines a "sales commission of $250,-000.00[.]"

The sum of the two figures in the two preceding paragraphs is $427,834.32. However, the judgment sets Bydalek's damages from Plaintiffs' conduct at $607,834.32. We glean from the record and the briefs that the additional $180,000 consisted of (a) the $100,-000 Bydalek paid BCPI to extend the closing date from July 9, 1993, to August 9, 1993, and (b) $80,000 incurred by Bydalek for "attorney fees and out-of-pocket litigation expenses."

The trial court further found that Bydalek was required by the Bydalek/Plaintiff contract to pay Plaintiffs $133,332 ($66,666 each), together with interest at 20 percent per annum, and said sum should be offset against the $607,834.32 awarded Bydalek from Plaintiffs.

The trial court entered judgment:

(A) Declaring Plaintiffs had no interest under the Bydalek/Plaintiff contract in any of

4. At the time of the closing, the 1994 judgment was on appeal. *Birdsong I,* 905 S.W.2d 896.

the three tracts and that Plaintiffs "had no interest since July 1, 1993 in said property or the [Bydalek/Seller contracts]."

(B) Declaring that when Plaintiffs did not get financing for the deal by July 1, 1993, their "interest under [the Bydalek/Seller contracts] immediately transferred to ... Bydalek and each [Plaintiff] became entitled to recover [$66,666] from ... Bydalek ... together with 20% interest from ... date of the closing of [the Bydalek/Seller contracts]."

(C) Declaring Bydalek/Seller contracts were in force "through and including September 12, 1994," and that they were "specifically performed" on that date.

(D) Denying all claims by Plaintiffs for damages and attorney fees against all defendants.

(E) Ordering that all notices of lis pendens be "released and discharged."

(F) Ordering that the Assignment Memo with the abbreviated version of the Bydalek/Plaintiff contract be "released and declared to be null, void and of no force or effect."

(G) Awarding Bydalek $474,502.32 ($607,-834.32 minus $133,332) against Plaintiffs, with interest at nine percent per annum from September 12, 1994.

All litigants then appealed from the amended judgment entry. In *Birdsong v. Bydalek*, 931 S.W.2d 217 (Mo.App.1996) or *Birdsong II*, we dismissed the appeals as the amended judgment still did not resolve all claims. *Id.* at 218.

On November 21, 1996, the trial court entered a second amended judgment that adjudicated all remaining claims. These three appeals followed.

PLAINTIFFS' APPEAL—No. 21369

*Point I: Tortious Interference With Contract*

Plaintiffs' first point avers the trial court erred in concluding that Plaintiffs "tortiously interfered with the purchase agreement." We infer that by the term "purchase agreement," Plaintiffs refer to the Bydalek/Seller contracts.

■ Tortious interference with a contract or business expectancy requires proof of five elements: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) an intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages. *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 408[2] (Mo.App.1996) (citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. banc 1993); *Community Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n*, 796 S.W.2d 369, 372[4] (Mo.banc 1990)). To prevail on this tort claim, a party must adduce substantial evidence supporting each and every element. *21 West, Inc. v. Meadowgreen Trails, Inc.*, 913 S.W.2d 858, 870 (Mo.App.1995).

Here, Point I(A) is an attempt to show that element 3, above, was not proven. Point I(A) asserts: "[T]here was no substantial evidence that but for the actions of [Plaintiffs], Bydalek and Seller[ ] would have completed the closing under the purchase agreement." Point I(B) charges "[t]here was no substantial evidence establishing absence of justification for [Plaintiffs'] actions[;]" hence, it challenged that element 4, above, was not proven. Finally, Point I(C) complains that element 5, above (damages), was not proven.

For reasons that will become obvious, we first address Point I(B) and then return to Point I(A). However, before evaluating any of Plaintiffs' arguments, we must clearly comprehend the tort of intentional interference with the performance of a contract.

■ In RESTATEMENT (SECOND) OF TORTS § 766 (1979), the cause of action is described as follows:

"One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

The above passage indicates that if Plaintiffs, by recording the notices of lis pendens

and Assignment Memo, prevented Seller from performing its contractual obligations to convey the three tracts to Bydalek at the appointed time, Plaintiffs were liable to Bydalek for her pecuniary loss resulting from Seller's failure to perform. The passage does not indicate that Plaintiffs were liable to *Seller* for interfering with the contract. That may be because the law contemplates that the party whose performance was prevented by the interferer would have an independent cause of action against the interferer for the wrongful act.

That is borne out by Comment "h" following § 766. It explains:

> "The phrase 'otherwise causing' refers to ... situations ... [such] as ... when A imprisons or commits such a battery upon B that he cannot perform his contract with C, or when A destroys the goods that B is about to deliver to C."

In the above examples the party whose performance is prevented by the interferer will have a tort claim against the interferer for, respectively, imprisonment, battery, or property destruction. Consequently, the party whose performance is prevented has a remedy other than a cause of action for tortious interference with the performance of a contract.

However, Plaintiffs do not contend that Seller, in suing for tortious interference with a contract, pursued the wrong remedy. Instead, Plaintiffs' first point asserts that three elements of that cause of action were not supported by sufficient evidence. We shall therefore assume, without deciding, that in the circumstances here, Seller can recover from Plaintiffs on a cause of action for tortious interference with a contract if the evidence is adequate to support each element of such a cause of action. Necessarily, however, Seller must rise or fall on the theory it opted to pursue and if, as Plaintiffs contend, there is not sufficient evidence in the record to support that theory, Seller will lose.

■ The fourth element of this tort, absence of justification, "[i]s the absence of any legal right to take the actions about which the other party complains." *21 West*, 913 S.W.2d at 870. Conversely, one may be jus-

tified in interfering with a contract if he or she has a legal right to do so. *Oliver*, 939 S.W.2d at 408[5]. No liability follows from interference with a contract or business expectancy if the action complained of was an act which the interferer had a definite legal right to do without any qualification. *Community Title*, 796 S.W.2d at 372[9].

The following portions of the trial court's second amended judgment address the "justification" element. Under the heading "Findings of Fact," the trial court declared:

> "60. Plaintiffs' rights to the Purchase Agreement and Addendum under the Joint Venture Agreement terminated as of July 1, 1993."

> "61. At no time after July 1, 1993 did plaintiffs have any valid interest in the Purchase Agreement, Addendum or the Real Estate described therein and plaintiffs knew that they had no interest therein."

> . . . .

> "69. Plaintiffs had no just reason for filing the memorandum or the *Lis Pendens* against the Real Estate."

As part of its "Conclusions of Law," the trial court found "there was no economic justification" for the filing by Plaintiffs of the "memorandum and ... lis pendens" notices because their contract with Bydalek provided Plaintiffs with a remedy for recovering the money they invested in the Bydalek/Seller contracts. The court said that the subject real estate was not unique and that Plaintiffs demonstrated, by their actions, that they did not consider it so. It then concluded that if Plaintiffs "had any legitimate claim ... against any of the defendants, damages were an adequate remedy."

■ An action for interference with contract does not lie where the alleged interferer has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected and employs no "improper means." *Oliver*, 939 S.W.2d at 408. An alleged interferer is said to have a "present existing economic interest" if he or she had "a prior contract with or a financial interest in the affairs of the person persuaded not to enter a contract." *See Ernst v.*

*Ford Motor Co.,* 813 S.W.2d 910, 920[26] (Mo.App.1991); *Pillow v. General American Life Ins. Co.,* 564 S.W.2d 276, 282 (Mo.App. 1978). *See also Wigley v. Capital Bank of Southwest Mo.,* 887 S.W.2d 715, 720 (Mo. App.1994).

■ Here, Plaintiffs had both a prior contract with and a financial interest in the affairs of Bydalek. The original Bydalek/Plaintiff contract (*see* Document II) said that if Plaintiffs were "unable" by July 1, 1993, to obtain financing for closing on July 9, 1993, the money they advanced to Bydalek "shall be treated as a loan" and the loan "shall ... [be] secured *by an interest in the real estate in question.*" Plaintiffs' status after July 1, 1993, was that of potential "secured creditor," i.e., a creditor entitled to some special pecuniary assurance of payment of his or her debt, such as a mortgage or lien on the subject real estate. *See* BLACK'S LAW DICTIONARY 1354 (6th ed. 1990). As creditors entitled to a security interest in the subject real estate, Plaintiffs had a bona fide, legal, economic interest in both the real estate and the Bydalek/Seller contracts, even after July 1, 1993. *See Ernst,* 813 S.W.2d at 920; *Pillow,* 564 S.W.2d at 282. The trial court's finding, whether deemed as express or implicit, that Plaintiffs did not have such an interest after that date is not supported by substantial evidence. We find Plaintiffs had a legal right to protect their "interest in the real estate in question[,]" *provided* they employed no "improper means." *See Community Title,* 796 S.W.2d at 373.

■ "For purposes of this tort, improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act

recognized by statute or the common law." *Id.* Moreover, the improper means must be a part of what procures the breach. *Wigley,* 887 S.W.2d at 721.

Here, the "improper means" found by the court, expressly or implicitly, stem from Plaintiffs' recording of the Assignment Memo and the notices of lis pendens. We first consider whether there is substantial evidence that Plaintiffs' recording of the notices of lis pendens was independently wrongful.

■ Recording a notice of lis pendens is authorized by § 527.260 in a civil suit making equitable claims involving real estate.[5] *See Kopp v. Franks,* 792 S.W.2d 413, 424 (Mo. App.1990). Moreover, an absolute privilege " 'attaches to the recordation of a lis pendens[,]' " provided the notice has reasonable relation to the action filed. *Houska v. Frederick,* 447 S.W.2d 514, 518 (Mo.1969) (quoting *Albertson v. Raboff,* 46 Cal.2d 375, 295 P.2d 405, 409 (1956)).

■ Although *Houska* and *Albertson* are slander of title cases, several courts have held that filing of a lis pendens notice is absolutely privileged so that an action based on interference with contract will not lie.[6] Thus, in *McDonald,* 119 Cal.App.3d 245, 173 Cal.Rptr. 836, the party claiming interference argued that the privilege was not applicable because "recordation of the notice of pending action was not undertaken to achieve the objects of the litigation." 173 Cal.Rptr. at 839. Relying on *Albertson,* the *McDonald* court rejected that argument, saying: "[R]ecordation of lis pendens is absolutely privileged even if made with actual malice. The [*Albertson* ] court imposed no limitations or

---

5. In pertinent part, § 527.260 says: "In any civil action, *based on any equitable right, claim or lien,* affecting or designed to affect real estate, the plaintiff *shall* file for record ... a written notice of the pendency of the suit...."

6. In *Westfield Dev. Co. v. Rifle Inv. Assoc.,* 786 P.2d 1112, 1116 (Colo.banc 1990), Justice Erickson listed these cases which adopt the absolute privilege rule: *Woodcourt II Ltd. v. McDonald Co.,* 119 Cal.App.3d 245, 248, 173 Cal.Rptr. 836, 838 (1981); *Procacci v. Zacco,* 402 So.2d 425, 426–27 (Fla.Dist.Ct.App.1981); *Lone v. Brown,* 199 N.J.Super. 420, 489 A.2d 1192, 1197 (App.

Div.1985); *Griffin v. Rowden,* 702 S.W.2d 692, 695 (Tex.App.1986). Authorities mentioned in *Westfield* as holding that there is only a qualified privilege to file a lis pendens are: *McReynolds v. Short,* 115 Ariz. 166, 564 P.2d 389, 393–94 (Ct. App.1977); *Epstein v. Carrier,* 12 Conn.App. 691, 533 A.2d 1221, 1224–25 (1987); *Guerdon Indus., Inc. v. Rose,* 399 N.W.2d 186, 188 (Minn.App. 1987); *Vintage Homes Inc. v. Levin,* 382 Pa.Super. 146, 554 A.2d 989, 994 (1989); *Toltec Watershed Improvement Dist. v. Johnston,* 717 P.2d 808, 814–15 (Wyo.1986).

qualifications on the absolute privilege it accorded notice of lis pendens...." *Id.*

Embracing the California view, Missouri law places no limitations or qualifications on the absolute privilege it accords lis pendens notices. *Houska,* 447 S.W.2d at 518–19; *Sharpton v. Lofton,* 721 S.W.2d 770, 777[11] (Mo.App.1986); *Kopp,* 792 S.W.2d at 424. Consequently, neither Plaintiffs' motive nor evidence tending to show motive is relevant. The only relevant inquiry is whether the lis pendens notices bore a reasonable relation to the action filed.

■ Here, there was a reasonable relationship between Plaintiffs' lis pendens notices and the suit they filed. Specifically, the relief sought by Plaintiffs in Counts I, II, and III was equitable in nature and concerned real estate. Plaintiffs' first count was under the declaratory judgment act and sought a declaration of the parties' "ownership and purchase rights as to the Property." This declaratory judgment count seeking resolution of competing claims to real estate interests was equitable in nature and governed by equity principles and rules. *See Connell v. Jersey Realty & Inv. Co.,* 352 Mo. 1122, 180 S.W.2d 49, 54[9] (1944). *See also, Mutual Drug Co. v. Sewall,* 353 Mo. 375, 182 S.W.2d 575, 576[1] (Mo.1944). Plaintiffs' second and third counts seeking specific performance contracts relating to the subject real estate were likewise equitable in nature. *Kopp,* 792 S.W.2d at 424–425.

We conclude that the recording of lis pendens notices in this case was legal and authorized by § 527.260. *See Houska,* 447 S.W.2d at 519. There was a reasonable relationship between the first three counts of Plaintiffs' petition and the notices of lis pendens; hence, Plaintiffs were absolutely privileged to file those notices. *See Sharpton,* 721 S.W.2d at 777[11] (Mo.App.1986); *Kopp,* 792 S.W.2d at 425. Therefore, the lis pendens notices did not provide substantial evidence that Plaintiffs used improper means to interfere with the Bydalek/Seller contracts.

In reaching this conclusion, we do not ignore Seller's argument that there is no absolute privilege to interfere with a contract by filing a notice of lis pendens; that such privilege is qualified and only applies if the interferer acts in good faith and in the honest belief he has a legally protected interest. In making this argument, Seller cites both *Houska,* 447 S.W.2d 514 and *Westfield,* 786 P.2d 1112. Apparently Seller has misread *Houska* and ignores the fact that the *Westfield* court adopted a view contrary to that reached in *Houska.*

Earlier we explained the extent to which our supreme court in *Houska* embraced the California view of absolute privilege as it was stated in *Albertson.* In *Westfield* the Colorado Supreme Court characterized *Albertson* as "[t]he leading case extending an absolute privilege to the filing of notice of a lis pendens[,]" 786 P.2d at 1116–17, but chose not to follow that view, saying

"We agree [with *Albertson* ] that the notice of lis pendens constitutes only a republication of the pleadings when the filing has a reasonable relation to the underlying lawsuit and otherwise complies with [the statute]. However, the policy of encouraging free access to the courts which is the basis of an absolute privilege is outweighed by the intentional and improper interference with contract by means of litigation not brought in good faith. We conclude that a party has only a qualified privilege to interfere with an existing contract by means of initiating litigation and filing pleadings and notice of lis pendens."

*Id.* at 1117.

Simply stated, there are differing views on this issue. Our supreme court agrees with the California view that lis pendens notices are absolutely privileged. Since Missouri follows *Albertson* and extends an absolute and unqualified privilege to lis pendens notices, Plaintiffs' motive for filing the notices is not relevant; likewise, the evidence on that issue is not relevant. As stated above, the relationship between the lis pendens notices and at least three counts of Plaintiffs' petition is patently obvious; consequently, there is no substantial evidence to support a finding of "improper means" from the filing of the notices.

■ Regarding the Assignment Memo, Plaintiffs omitted the following details therefrom: (1) as of July 1, 1993, Plaintiffs did not

have financing for the deal and Bydalek was aware of that fact; (2) without the financing Plaintiffs were contractually obligated to reassign their rights to the purchase contract. These omissions could have been viewed as misleading.

Bydalek and Seller contend that such calculated omissions were properly viewed by the trial court as a misrepresentation of fact; thus, recordation of the Assignment Memo was independently wrongful and constituted a "false or improper" action that supports this tort. However, the Assignment Memo also omitted facts favorable to Plaintiffs, specifically their contractual right to a security interest "in the real estate in question" should their financing efforts fail. Moreover, within twenty-four hours of the Assignment Memo's recordation, Plaintiffs disclosed publicly an unabridged copy when they filed their petition with the circuit clerk.

We need not decide, however, if these and other facts in the record provide substantial evidence that Plaintiffs used improper means when they recorded the Assignment Memo. In Point I(A), Plaintiffs argue that Bydalek and Seller did not produce substantial evidence of a causal connection between Plaintiffs' act of recording the Assignment Memo and Bydalek's and Seller's failure to consummate the sale. We agree.

In *Tri–Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, (Mo.App.1976) the court stated, "the concept of causation is inherent within the meaning of inducement; therefore, to establish liability in a tortious interference with contract case, the plaintiff must show that the defendant's acts caused the breach." *Id.* at 215[6]. The *Tri–Continental* court employed a two-step approach in analyzing the evidence of causation: "1) did the defendant actively and affirmatively take steps to induce the breach, and, if so, 2) would the contract have been performed absent the defendant's interference?" *Id.* at 217[7]. In *Tri–Continental*, the eastern district found that plaintiff's claim failed the second prong of the causation test because the evidence showed that defendant had decided to breach the contact anyway, and the interference could not be characterized as a but-for cause. *Id.* at 217.

Here, the evidence failed to show that "but for" the act of Plaintiffs' recording the Assignment Memo, Bydalek and Seller could have closed their sale in August 1993. Plaintiffs recorded the potentially misleading document on July 8, 1993. Within twenty-four hours thereof, Plaintiffs filed their first notice of lis pendens and filed their lawsuit which contained a complete copy of the Bydalek/Plaintiff contract. All witnesses testifying on the subject agreed that the presence on the record of the lis pendens notices, standing alone, prevented closing in August 1993.

In light of our holding that the recording of lis pendens was absolutely privileged, and the fact that the lis pendens and the Assignment Memo *equally* clouded title to the subject real estate, Bydalek and Seller cannot demonstrate a causal connection between the filing of the Assignment Memo and the failure to close the sale in August 1993. Without proof of a causal connection between the Assignment Memo and the failure to close the sale in August 1993, their interference tort claims fail. *See Rusk Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671, 680 (Mo.App.1985).

We find the trial court erred in ruling that Plaintiffs tortiously interfered with the Bydalek/Seller contracts. The portion of the judgment awarding damages against Plaintiffs on Bydalek's and Seller's claims for tortious interference with contract is reversed.

*Point VII: Breach of Contract*

Plaintiffs' seventh point challenges the trial court's conclusions and judgment regarding breach of contract. We note that even a charitable reading of Bydalek's counterclaim does not reveal that she ever pled a breach of contract claim. However, Plaintiffs do not contest the lack of a pleading regarding breach of contract. Presumably, Plaintiffs consider that the breach of contract claim was tried by express or implied consent. *See* Rule 55.33(b).

Point VII contains two sub-parts. The first advances an excuse for Plaintiffs' failure to reassign their interest under the Bydalek/Plaintiff contract. The second sub-part

asserts that damages awarded to Bydalek were not established by competent evidence and did not stem from Plaintiffs' actions. We base our decision upon the reasoning advanced in the second sub-part of Point VII.

The trial court found that due to "the conduct of plaintiffs with respect to the closing of [the Bydalek/Seller contracts] ... Bydalek has been damaged in the sum of $100,000.00 for the extension fee which was expended by ... Bydalek on July 9, 1993, $250,000.00 for real estate commission and $80,000.00 for attorney's fees...." Additionally, the trial court concluded:

"11. After July 1, 1993, [Plaintiffs] did not reassign their interest in the real estate purchase agreement to Bydalek as required by the agreement of May 14, 1993.

"12. [Plaintiffs] breached the agreement of May 14, 1993, by failing and refusing to reassign their interest in the real estate purchase agreement of April 16, 1993, and by reason of this breach of contract, are liable to Bydalek for money damages.

. . . .

"14. Bydalek has been damaged by the failure and refusal of [Plaintiffs] to reassign their interest in the real estate purchase agreement to Bydalek.

"15. Bydalek is entitled to an award of actual damages against [[P]laintiffs] ... for breach of contract in an amount of $430,000.00."

Plaintiffs challenge each damage amount separately, starting with the $100,000 extension fee as an item of damage.[7] They argue that Bydalek's extension of the closing date is not attributable to any action on their part. In fact, Plaintiffs point out that they did not know that Bydalek had made the agreement to extend the closing date. Bydalek attempts to counter this argument by asserting that, but for Plaintiffs' lack of diligent efforts to obtain financing, she would not have needed to extend the closing date. In addition,

Bydalek directs us to the court's finding that the extension agreement negotiated on June 11, 1993, did not become effective until July 9, 1993, after Plaintiffs' breach of contract occurred.

Contrary to Bydalek's arguments, Plaintiffs were not found to be liable for their failure to obtain financing. Rather, the Bydalek/Plaintiff contract (*see* Document II) provided a remedy in the event that Plaintiffs could not obtain financing. That remedy was the obligation imposed on Plaintiffs to retransfer their interest. Plaintiffs failed to perform their duty to retransfer; consequently, the trial's court's award was based on what it perceived to be harm that Bydalek sustained from Plaintiffs' failure to retransfer and not their failure to obtain financing.

■■ An award of damages in a breach of contract case generally serves the goal of placing the non-breaching party in as good a position as he or she would have been if the contract had been performed. *Gee v. Payne,* 939 S.W.2d 383, 385[4] (Mo.App.1997). The appropriate measure of damages is a question of law to be determined by the trial court based upon the particular facts and circumstances of each case. *Id.* at 385[3]. In an action for breach of contract, a plaintiff may recover the benefit of his or her bargain as well as damages naturally and proximately caused by the breach and damages that could have been reasonably contemplated by the defendant at the time of the agreement. *Mansfield v. Trailways, Inc.,* 732 S.W.2d 547, 552[1] (Mo.App.1987).

■■ Turning to 11 Samuel Williston & Walter H.E. Jaeger, A Treatise On The Law Of Contracts § 1344 (3d ed. 1968), we find that in contracts, a breaching party is only liable for those consequences that were reasonably foreseeable at the time the parties entered into the contract. The Restatement (Second) of Contracts § 351 (1981) provides more insight into the issue of foreseeability, stating:

---

**7.** Plaintiffs structure their brief as follows: Their second point details their argument that the $100,000 extension fee was not a proper item of damages. Their third point addresses the $250,000 real estate commission and their fourth point

presents their argument that the $80,000 attorney fee component was erroneously included. Their seventh point—which we now address—references these earlier points.

"(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

"(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

"(a) in the ordinary course of events, or

"(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know."

 As mentioned above, Plaintiffs' breach was their failure to retransfer their two-thirds interest in the real estate contract to Bydalek. The disputed $100,000 component of the damage award was not a benefit of Bydalek's bargain with Plaintiffs. In addition, the trial court found that Plaintiffs' interest automatically transferred back to Bydalek on July 1, 1993. In light of this finding (which is not challenged by Plaintiffs or Bydalek), Plaintiffs could not have reasonably contemplated Bydalek's expenditure of funds to extend the closing date as a result of failing to retransfer their interest. The trial court erred by including Bydalek's $100,000 extension fee as a loss that she could recover because of Plaintiffs' failure to retransfer.

 Next, Plaintiffs charge that the $250,000 component of the damage award representing the real estate commission paid by Bydalek was not a loss proximately caused by their failure to retransfer. We agree. Bydalek's employment of a realtor and that realtor's commission were not benefits of Plaintiffs' and Bydalek's bargain. Plaintiffs' failure to retransfer their interests was not the proximate cause of Bydalek's employment of a realtor. Nor could Plaintiffs have foreseen Bydalek's employment of a realtor in relation to their obligation to retransfer their interests. Again, there was no foreseeable relationship between Plaintiffs' obligation to retransfer their interest and the employment of a realtor. The trial court's inclusion of $250,000 attributable to a real estate commission in the award of damages was erroneous.

We review separately the trial court's award to Bydalek of $80,000 for her attorney fees. Missouri courts have consistently fol-lowed the "American Rule" that, with certain exceptions, litigants bear the expense of their own attorney fees. *Brown v. Mercantile Bank of Poplar Bluff*, 820 S.W.2d 327, 339[22] (Mo.App.1991). The recognized exceptions to the rule fall into four categories: (1) contractual agreement to pay the fees; (2) statutory provision allowing recovery of the fees; (3) recovery as damages to a wronged party involved in collateral litigation; and, (4) reimbursement ordered by a court of equity to balance benefits. *Id.* at 340[22]; *Arnold v. Edelman*, 392 S.W.2d 231, 239 (Mo.1965).

 We agree with Plaintiffs that this case does not fit into any of the recognized exceptions to the American Rule. Nonetheless, Bydalek advances two arguments to support the attorney fee award. First, Bydalek argues that her counterclaim is sufficiently similar to a claim for malicious prosecution. However, only Bydalek's tortious interference claim, not breach of contract claim, bears any resemblance to malicious prosecution. Under Point I, we reversed the judgment for Bydalek on her tort claim. Recovery for attorney fees under the breach of contract rationale cannot be justified by an argument that her tort claim—which has been reversed—resembles a cause of action for which attorney fees may be awarded.

 Bydalek's second argument maintains that attorney fee recovery was authorized because Missouri courts in declaratory judgment actions have awarded such fees as Chapter 527.010 "costs." *See Bernheimer v. First National Bank of Kansas City*, 359 Mo. 1119, 225 S.W.2d 745, 755 (1949); *American Economy Ins. Co. v. Ledbetter*, 903 S.W.2d 272, 276 (Mo.App.1995). This argument fails because the trial court awarded attorney fees as a component of damages sustained under Bydalek's counterclaim. Bydalek in her counterclaim did not request declaratory relief. Moreover, Bydalek never sought attorney fees in any response she filed to Plaintiffs' declaratory judgment count. Bydalek cannot take advantage of Missouri court interpretations of the declaratory judgment law when she did not request declaratory judgment in her counterclaim, nor request attorney fees in response to

Plaintiffs' petition for declaratory relief. Thus, we find the trial court erred in awarding Bydalek $80,000 for attorney fees.

The portion of the judgment awarding damages in favor of Bydalek and against Plaintiffs on Bydalek's claim for breach of contract is reversed.[8]

*Point VIII: Plaintiffs' Breach of Contract Count Against Bydalek*

In their eighth point, Plaintiffs charge that the trial court erred when it found that Bydalek never breached her contract with Plaintiffs. Plaintiffs argue that the trial court should have read into the Bydalek/Plaintiff contract certain "implied contract obligations" and then should have found that Bydalek breached all such commitments. The four contract obligations that Plaintiffs say should have been imposed on Bydalek by implication were: (1) informing Plaintiffs of the release of escrow funds and her extension agreement with Seller; (2) providing Plaintiffs with tax returns and financial statement; (3) promptly furnishing an appraisal and not misleading Plaintiffs about its status; and (4) giving Plaintiffs information about title commitments and other documents supplied by Seller.[9]

 Our supreme court has stated the following as principles to be applied when considering whether specific contract provisions are to be created by implication:

" '[I]n order that an unexpressed [contract] term may be implied, the implication must arise from the language employed in the instrument or be indispensable to effectuate the intention of the parties; * * *. Accordingly, there can be no implication as against the express terms of the contract; and the courts will be careful not to imply a term, * * * as to which the contract is intentionally silent, * * *.' "

*Glass v. Mancuso,* 444 S.W.2d 467, 478 (Mo. 1969) (quoting 17A C.J.S. *Contracts* § 328, at 287–91). Additional rules of law that govern are stated in *Conservative Federal Savings & Loan Ass'n. v. Warnecke,* 324 S.W.2d 471 (Mo.App.1959).

"It is a general rule of law that when parties reduce their agreements to writing it is presumed that the instrument contains their entire contract, and the court will not read into it additional provisions unless this be necessary to effectuate the intention of the parties as disclosed by the contract as a whole. Implied obligations must rest entirely upon the presumed intention of the parties, as gathered from the terms actually expressed in the writing itself; and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate with reference thereto, or it must appear that it is necessary to infer such an obligation to effectuate the full purpose of the contract. It is not enough to say that the implied covenant is necessary to make the agreement fair, or that without such covenant it would be improvident or unwise, or that the contract will operate unjustly.... No implied provision can be inserted ... to supply a covenant upon which it was intentionally silent...."

*Id.* at 478–79[1–4]. *See also Henderson v. Brown Elec. Supply Co.,* 555 S.W.2d 635, 639[9] (Mo.App.1977).

---

**8.** For the reasons stated in note 7, our analysis of Point VII makes it unnecessary that we discuss Plaintiffs' second, third, and fourth points relied on. Plaintiffs' fifth point charges error when the trial court allowed Seller to amend its pleadings after remand in *Birdsong I.* However, that point is rendered moot by our reversal of damage awards against Plaintiffs. Likewise, such reversal renders Plaintiffs' sixth point moot. Their sixth point claims that the trial court erred in ordering Plaintiffs to pay Bydalek the interest she was forced to pay Seller, i.e., that which accrued on Seller's loan after August 9, 1993.

**9.** Plaintiffs' eighth point attempts to raise an additional claim of trial court error. Specifically, the point charges that the trial court erred by not finding that Bydalek anticipatorily breached the assignment agreement by repudiation. A point which contains multifarious claims of error is not in compliance with Rule 84.04(d) and does not deserve our review. *DeCota Elec. & Ind. Supply, Inc. v. Continental Cas. Co.,* 886 S.W.2d 940, 941 (Mo.App.1994). With exceptions not pertinent to this case, allegations of error not properly briefed shall not be considered on appeal. Rule 84.13. Accordingly, we do not consider the disparate contention of trial court error raised in point eight.

■ We find nothing in the language used in the Bydalek/Plaintiff contract (*see* Document II) that compels the implication of the specific contract provisions urged by Plaintiffs. It is obvious that this contract enabled Bydalek to get partners with the ability to obtain financing and quick cash and in return, gave Plaintiffs an ownership interest in the contract if they got financing by July 1. To effectuate that intention it is not necessary to infer the implied contractual obligations as Plaintiffs contend.

■ Nor do we find from the evidence that the specific contractual duties suggested by Plaintiffs must be implied to "effectuate the intention of the parties," *see Glass,* 444 S.W.2d at 478, or that it was "so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate with reference thereto." *Conservative Federal,* 324 S.W.2d at 479[2]. To the contrary, there was evidence to support the following findings and conclusions of the trial court:

"16. There was no discussion between [Plaintiffs] and Bydalek, on May 13 or ... 14 about Bydalek being required to furnish a financial statement, copies of income tax returns, to sign a loan application, or to obtain an appraisal of the Branson property.

. . . .

"20. There were no terms discussed on May 13 or ... 14 which were not included in the written agreement of May 14, 1993. The agreement was a complete instrument.

"21. [Plaintiffs] understood they agreed to obtain financing to close the purchase price; it was their responsibility to go out and obtain the financing, and there were no limitations as to how they would get the financing.

"22. It was not out of the realm of possibility that [Plaintiffs] could fund the purchase out of their own resources. They could have gotten the financing in some other way other than on the property itself, but that was not probable.

. . . .

"27. On ... May 16, 1993, Bydalek met [Plaintiffs] at Branson. Bydalek did not agree to furnish her financial statement or income tax returns. Bydalek did agree to contact an appraiser and a real estate sales person, Jan James.

"28. On ... May 17, 1993, Bydalek contacted an appraiser and requested an appraisal be completed as soon as possible on the Branson Land. Bydalek offered to pay extra money for early completion of the appraisal. Bydalek called the appraiser many times asking that the appraisal be expedited.

. . . .

"32. On or about May 16, 1993 ... Bydalek undertook the obligation to provide an appraisal of the Real Estate to assist plaintiffs in securing financing.... Bydalek promptly undertook to secure such appraisal from the Swan Valuation Group, Inc. and diligently pursued the completion of said appraisal, which was furnished and provided to plaintiffs on June 29, 1993.

. . . .

"38. On June 11, 1993 ... Bydalek and BCPI, together with Tri–Lakes Escrow, Inc. entered into an Escrow Agreement whereby the earnest money deposits under the Agreement and Addendum were to be released to BCPI and BCPI was to deliver deeds and a title commitment for the property to Tri–Lakes Escrow, Inc. to be held pending closing. Said Agreement further provided that counsel for Bydalek had reviewed and approved the deeds and title commitment submitted by BCPI to ... Bydalek.

"39. Plaintiffs' attorney, Ralph Hunt, had possession of a draft of the Escrow Agreement and a memorandum detailing the terms of the Escrow Agreement for more than ten days prior to the execution thereof, but made no objection to the terms of the Escrow Agreement nor did he suggest any revisions thereto.

"40.... Bydalek was acting for the benefit of the joint venture with Plaintiffs (herein the "K, B & B Joint Venture") when she executed the Escrow Agreement and plaintiffs made no attempts to terminate the authority of ... Bydalek to act on behalf of the K, B & B Joint Venture with respect thereto.

. . . .

"42. On June 11, 1993 . . . Bydalek and BCPI entered into an agreement whereby . . . Bydalek could purchase a 30–day extension of the closing date of the Purchase Agreement and Addendum for the payment of $100,000 to be made on or before July 9, 1993. . . .

"43. The purpose of the Extension Agreement was to allow . . . Bydalek additional time to secure financing in the event plaintiffs were unable to do so on or before July 1, 1993 and was not intended to, and did not, interfere with plaintiffs' rights under Joint Venture Agreement, or prelude the K, B & B Joint Venture from closing by July 9, 1993."

Evidence exists in this record that certainly would support findings contrary to those above. However, we defer to the trial court's findings, given the trial court's superior ability to judge the credibility of witnesses. *Brawley v. McNary*, 811 S.W.2d 362, 365[1] (Mo.banc 1991). The trial judge as trier of fact may disbelieve testimony even if it is uncontradicted. *Trapp v. Barley*, 897 S.W.2d 159, 164[3] (Mo.App.1995).

■ Based upon this record, we know of no principle upon which it can be said that the trial court erred when it failed to read into this contract the specific provisions urged by Plaintiffs. In so stating, we do not ignore cases holding that every contract imposes upon each party the *general duty* of good faith and fair dealing in its performance and enforcement, *Wulfing v. Kansas City Southern Ind., Inc.*, 842 S.W.2d 133, 157 (Mo.App.1992), a *general duty* to cooperate so as to enable performance and achievement of expected benefits, *McKnight v. Midwest Eye Institute*, 799 S.W.2d 909, 915 (Mo.App. 1990), and a *general duty* "not to prevent or hinder performance by the other party." *Robinson v. Powers*, 777 S.W.2d 675, 681[7] (Mo.App.1989).

As written, Plaintiffs' eighth point does not claim a breach of the general duties of good faith and fair dealing as spoken of in *Wulfing, McKnight,* and *Robinson.* Instead, Plaintiffs' point asserts breaches of specific implied contractual obligations. By focusing on these alleged specific contractual obligations, Plaintiffs go beyond challenging generalized notions of good faith and fair dealing to creating implied contractual duties. Such implied duties must be examined under the standards set forth in *Mancuso* and *Warnecke.*[10]

As previously noted, examination of the record indicates that the findings and conclusions set forth under this point are supported by the evidence. Therefore, there can be no basis for a determination that such findings and conclusions are clearly erroneous or against the weight of the evidence. Plaintiffs' arguments to the contrary are rejected. Point VIII is denied.

*Point IX: Plaintiffs' Fiduciary Duty Claim Against Bydalek*

In Plaintiffs' ninth point they challenge the trial court's judgment that Bydalek did not breach fiduciary duties owed to Plaintiffs. They claim Bydalek breached her fiduciary duty to her fellow joint venturers in the following ways: (1) by not disclosing information regarding escrowed funds and the extension of the closing date; (2) by failing to disclose her tax returns and a financial statement; (3) by failing to promptly provide an appraisal and withholding information about the appraisal; (4) by failing to provide information regarding the title commitment and other documents; and, (5) by telling Plaintiffs before entering the joint venture that she had contracted to buy the real estate known as Lot 6 and an easement when she had not. We find that the only breach of fiduciary duty committed by Bydalek was her failure to inform Plaintiffs of her agreement with Seller to extend the closing date from July 9, 1993, to August 9, 1993.

10. It is only the argument section of Plaintiffs' brief that contains references to the implied duties of good faith, fair dealing, cooperation, and non-hinderance and then suggests that the trial court erred in not finding breaches of those implied obligations. Those contentions are not contained in the point relied on. Issues reflected only in the argument section of the brief are not presented for appellate review. *First Assembly Church v. Ticor Title Insurance Co.*, 872 S.W.2d 577, 581 n. 6 (Mo.App.1994).

Bydalek's fiduciary duty to Plaintiffs lies in the fact that they entered into a joint venture. A joint venture is recognized as a type of partnership. *Terre Du Lac Ass'n v. Terre Du Lac, Inc.*, 737 S.W.2d 206, 217[20] (Mo.App.1987). As such, the rights of joint venturers are governed by the Missouri Uniform Partnership Act and rules of law applicable to partnerships. *Id.; Stram v. Miller*, 663 S.W.2d 269, 277[25] (Mo.App. 1983). Joint venturers owe one another fiduciary duty and are bound by standards of good conduct and fair dealing within the scope of the enterprise. *Scott v. Kempland*, 264 S.W.2d 349, 355[8] (Mo.1954). Each joint venturer occupies a fiduciary relationship with the other joint venturers, and this fiduciary relationship entails an "absolute, affirmative duty to disclose all pertinent information pertaining to the joint venture" to the other joint venturers. *DeFabio v. Mackey*, 493 S.W.2d 355, 359[4] (Mo.App.1973).

Bydalek argues that her agreement to extend the closing date did not interfere with Plaintiffs' ability to obtain financing or attempts to obtain financing. Thus, she asserts that she did not breach her fiduciary obligations under the Bydalek/Plaintiff agreement. Bydalek misses the point that her fiduciary obligation arose from her business relationship with Plaintiffs as joint venturers.

The Bydalek/Plaintiff contract (*see* Document II) gave Plaintiffs a two-thirds interest in the Bydalek/Seller agreements. Section 1.1 of the Bydalek/Seller contracts (*see* Document I) allowed the Buyer and Seller to agree on another closing date, provided that the agreement be in writing. Bydalek exercised this contractual right to extend the closing date on June 11, 1993, when Plaintiffs had both a two-thirds interest in the Bydalek/Seller contracts and a fiduciary relationship with her. She should have informed Plaintiffs about her unilateral dealings involving contractual rights in which they had an interest. By failing to inform Plaintiffs of the extension, she breached a duty arising from her fiduciary relationship with Plaintiffs.

We reverse that part of the trial court's judgment that denied Plaintiffs' claim for damages for breach by Bydalek of her fiduciary duties to Plaintiffs and remand for further proceedings.

*Point X: Was Retransfer of Contract Excused by Bydalek's Acts*

Plaintiffs' tenth point contends that the trial court erred in finding that Plaintiffs had no interest in the Bydalek/Seller contracts after July 1, 1993. Plaintiffs insist that Bydalek "breached numerous contractual and implied obligations and anticipatorily repudiated [the Bydalek/Plaintiff contract] and thereby prevented them from performance, which excused them from further performance and preserved their rights under [the Bydalek/Seller contracts]."

In developing this point, Plaintiffs merely restate their claims made in Points VIII and IX regarding alleged breaches of contract duties and fiduciary obligations. Plaintiffs say that those breaches by Bydalek excused them from performance and entitled them to specific performance of the Bydalek/Seller contracts. Fatal to this point is our earlier rejection of all of Plaintiffs' claims that Bydalek breached her contract obligations and our denial, with one exception, of Plaintiffs' contentions that Bydalek violated her fiduciary obligations under the Bydalek/Plaintiff contract (*see* Document II).

Plaintiffs may have been damaged by Bydalek's failure to share with them the opportunity to extend the Bydalek/Seller contracts. However, Plaintiffs have not demonstrated nor can we perceive how Bydalek's breach of that duty prevented Plaintiffs from reassigning their interest in the Bydalek/Plaintiff contract. Point X is denied.

*Point XI: Plaintiffs' Breach of Contract Claim Against Seller*

Plaintiffs' eleventh point charges that the trial court erred when it denied Plaintiffs' claim against Seller for breach of contract. In particular, Plaintiffs contend that Seller breached obligations by refusing to communicate with Plaintiffs and by failing to provide "necessary information and documentation, despite the fact that [Plaintiffs] gave notice that they were assignees under the purchase agreement and requested said information and documentation."

To explain what Plaintiffs contend were Seller's contractual obligations to communicate and provide documents, we quote from their brief:

"[Seller] failed and refused to communicate and cooperate with [Plaintiffs] and failed and refused to provide copies of the closing documents and other documents they requested and which the Seller[ ][was] required to furnish under the Purchase Agreement.

. . . .

"Pursuant to the Purchase Agreement and the Escrow Agreement signed on June 11, 1993, Seller[ ][was] required to provide to 'Buyer' the documents referred to in the Escrow Agreement, namely title commitments and copies of warranty deeds. . . . In paragraph 84 of the trial court's findings of facts . . . and paragraph 17 of the court's conclusions of law . . . , it found that Seller[ ] did provide these documents to Bydalek and her attorney and thereby provided them to [Plaintiffs]. . . . This finding is clearly erroneous. Seller[ ] and [its] attorneys knew [Plaintiffs] were claiming an interest as assignees and that Bydalek was not cooperating or communicating with them. *They were thus required to investigate the matter further and provide these documents to [Plaintiffs]. By failing to do so, they breached the Purchase Agreement.*" (emphasis supplied).

From these excerpts, we understand Plaintiffs' sole complaint to be that Seller is guilty of breaching the Bydalek/Seller contracts by delivering title commitment information and warranty deed copies to Bydalek only. We find no merit to this argument.

As stated earlier, the Bydalek/Plaintiff agreement is governed by the Uniform Partnership Act (UPA). *Terre Du Lac Ass'n,* 737 S.W.2d at 217. Under the UPA, "[n]otice to any partner of any matter relating to partnership affairs" operates as notice to the partnership. § 358.120. *See Great Western Trading v. Mercantile Trust Co.,* 661 S.W.2d 40, 44[5] (Mo.App.1983); *Sommers v. Hergenreter,* 523 S.W.2d 176, 182[2] (Mo.App. 1975).

The UPA also states that "[e]very partner is an agent of the partnership for the purpose of its business, and the act of every partner . . . for apparently carrying on in the usual way the business of the partnership" binds the partnership, unless the partner in fact lacks authority and the third person with whom he is dealing "has knowledge" of that fact. § 358.090.1. The agency thus established may include actual and apparent authority. *Baker v. McCue–Moyle Development Co.,* 695 S.W.2d 906, 911[7,8] (Mo.App. 1984). "The extent of a partner's authority, actual or apparent, depends on a determination of the scope of the business of the partnership." 25 Louis & Brown, Mo.Prac., Business Organizations § 4.5, at 70 (1993). In dealing with a partner, a third party is entitled to rely on appearances and is not constrained by an unrevealed limitation on a partner's actual authority unless it has "knowledge" of the limitation. *Id.*

Here, Birdsong told attorney Shantz on May 26, 1993, that he and Kelling had an interest in the property and were partners with Bydalek. From this and also later communications, Seller knew that Plaintiffs claimed Bydalek as a partner and that their partnership involved the subject land. Seller also knew that problems had arisen between Plaintiffs and Bydalek soon after their joint venture contract was signed; yet Plaintiffs never explicitly told Seller or its representatives that Bydalek was without authority to act on their behalf. It is true that Birdsong testified that during his telephone conversation with Shantz on May 26, 1993, he told Shantz that Bydalek "didn't speak for us;" yet, when Birdsong wrote a memorandum about that call, he never mentioned that comment. The trial court found that Plaintiffs "had never notified [Seller] or any other party to the transaction that . . . Bydalek could not act on behalf of plaintiffs pursuant to the Joint Venture Agreement." Apparently, the trial judge did not believe Birdsong's testimony about the content of the telephone call and he was, of course, entitled to disbelieve. *See Matter of Estate of Rose,* 896 S.W.2d 511, 512[2] (Mo.App.1995).

In response to Birdsong's call, Shantz spoke with Bratvold, and was told that any claimed interest on the part of Plaintiffs was "premature," and all further communications

with Birdsong should be handled through Bratvold. This incident and other evidence clearly show that Seller knew there was some type of dispute between Bydalek and Plaintiffs. However, Plaintiffs cite no authority, nor has this court found any, for the notion that Seller's knowledge of a dispute between the partners—without more—constitutes a withdrawal of authority of a partner to act on behalf of the partnership. Nor do Plaintiffs cite authority saying that once Seller learned the partners were not communicating among themselves, Seller became obligated to investigate and send copies of the documents to every partner. To the contrary, the "usual way of business" language of § 358.090(1) specifies "a set of situations in which the third party is not on notice of the need to investigate the agent's authority." 1 BROMBERG & RIBSTEIN ON PARTNERSHIP § 4.01(b)(4), at 4:10 (Rel. No. 2 Oct. 1996).

In their communications with Seller, Plaintiffs represented to Seller that they were partners with Bydalek in the land deal. As revealed to Seller by Plaintiffs, the "usual way of business" of this joint venture involved the Bydalek/Seller contracts. Under the circumstances, Seller had no duty to investigate if Bydalek was an "agent of the partnership for the purpose of its business." *See* § 358.090.1. Plaintiffs' argument to the contrary is rejected.

 In reaching this conclusion, we recognize that the term "knowledge" as used in § 358.090.1 is either actual knowledge of a fact—which we do not find here—or "knowledge of such other facts as in the circumstances shows bad faith." *See* § 358.030.1. The trial court's judgment states that Plaintiffs' claims against Seller "arise at best from mere suspicions by plaintiffs of wrongdoing on the part of said defendants." We interpret that to mean that the trial court found no bad faith by Seller when it delivered contract documents to Bydalek only or her lawyer and refused to deliver such documents to Plaintiffs. Given the trial court's superior ability to resolve witness credibility, there is in this record sufficient evidence to support the trial court's findings on this issue. § 358.030.1.

There were two documents that the Bydalek/Seller contracts required Seller to deliver. The first was a title commitment showing marketable title. Delivery thereof was to occur within thirty days before closing. The second document required was "[a] duly executed and acknowledged Warranty Deed ... conveying the Property to Buyer." The latter was to be delivered at closing. The trial court found that the title commitment was timely delivered to Bydalek's lawyer. The warranty deed was presumably delivered to Bydalek by the escrow agent when the sale was finally closed in September 1994.

The escrow agreement required that copies of the deeds and other closing documents be delivered. On the face of the instrument, Bydalek acknowledged getting copies of the deeds and other proposed closing documents. Thus, the documents required to be delivered were in fact delivered to an agent of the partnership—Bydalek or her lawyer.

Plaintiffs have not demonstrated that the trial court's conclusions on this subject are without evidentiary support, are against the weight of the evidence, misapply the law, or misstate the law. The trial court's denial of Plaintiffs' claim against Seller is not erroneous. Point XI is denied.

### SELLER'S APPEAL—No. 21376

Seller's sole point claims that the trial court erred by failing to award judgment against Plaintiffs and in its favor "for the loss of the use of the entire purchase price from the date the sale would have closed" until the actual date of closing. In short, Seller claims entitlement to greater damages than what the trial court awarded it.

Earlier in Plaintiffs' appeal, we held that neither Seller nor Bydalek had a tort claim against Plaintiffs for interference with contract. We reversed the judgment entered against Plaintiffs based on the tortious interference claims. In light of that reversal, clearly this point fails.

### BYDALEK'S APPEAL—NO. 21390

 The original contract between Bydalek and Seller indicates that if litigation to enforce the agreement ensued, "the prevail-

ing party shall be entitled to recover its cost, as well as all attorney fees...." Bydalek's first two points charge that the trial court erred when it adjudged Seller the prevailing party and ordered Bydalek to pay Seller's attorney fees and interest after August 9, 1993, and until closing.

To develop her argument, Bydalek relies solely on the American Heritage Dictionary where "prevail" is defined as meaning "triumph" or to "win out." She asserts that "[b]y the plain meaning of the phrase 'prevailing party,' [Seller] was not entitled to interest or attorneys' fees." To explain, Bydalek points to this language in the amended judgment entry of November 9, 1995: "[S]aid Purchase Agreement and Addendum should be specifically performed by the parties thereto...." Bydalek says it is clear from this sentence that "either both parties were 'prevailing parties' or neither party was a 'prevailing party' ... in that both parties requested specific performance of the Purchase Agreement and Addendum, and both obtained that relief." With this as her premise—but without citation to authority—Bydalek insists that the trial court erroneously applied the law when it concluded that Seller was the prevailing party and ordered her to pay attorney fees and interest. We disagree.

Bydalek filed a cross-claim against Seller that sounded in specific performance and breach of contract. At trial, Seller stated that it was willing and able to perform its contract with Bydalek and was "willing for the Court to enter an order requiring them to specifically perform...." Seller tempered this, however by saying: "We believe that under the law we are entitled to our interest, and ... attorney's fees ... but yes, we are willing to perform." Later, Seller amended its pleadings so as to specifically request reasonable attorney fees and "such other and further relief as the court deems just."

In its second amended judgment entry the trial court found:

"55. [Seller] was the prevailing party as between it and ... Bydalek in that the Court has ordered specific performance of the Purchase Agreement and Addendum but finds that failure to close said transac-

tion prior to September 12, 1994, was in no part due to the fault or breach of [Seller] as alleged in ... Bydalek's Cross-claim against [Seller]. As amended by statement of counsel at trial, the court grants [Seller] the relief it requested in Count I of its Second Amended Cross-claim and Counterclaim."

BLACK'S LAW DICTIONARY, page 1188 (6th ed. 1990) defines "prevailing party" like this:

"The party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. The one in whose favor the decision ... is rendered and judgment entered ...." (citations omitted).

In *Ozias v. Haley,* 141 Mo.App. 637, 125 S.W. 556 (1910), the question arose about cost assessment in multi-claim litigation. The western district dealt with the question of who "prevailed" as follows:

"It transpires frequently that in the verdict each party wins on some of the issues and as to such issues he prevails, but the party in whose favor the verdict compels a judgment is the prevailing party. Each side may score, but the one with the most points at the end of the contest is the winner...."

*Id.* 125 S.W. at 557.

Here, Seller successfully defended against Bydalek's claims for money damages and attorney fees. The trial court expressly found that Seller did not breach the contract as Bydalek alleged and denied her requests for attorney fees and damages. Seller was successful in its claims for money damages from Bydalek. Specifically, the trial court adjudged that Bydalek should pay Seller's attorney fees, interest and costs. As to the equitable claims, the trial court ordered specific performance but expressly found that the "failure to close said transaction ... was in no part due to the fault or breach of [Seller] as alleged in ... Bydalek's Cross-claim against [Seller]." Under the circumstances, the trial court did not err in concluding that Seller was the "prevailing party" as between it and Bydalek. This is so whether

the phrase "prevailing party" is measured by the BLACK'S LAW DICTIONARY definition or is analyzed under *Ozias.* We reject Bydalek's argument to the contrary. We deny Bydalek's first point.

In her brief, Bydalek says that her second point "flows directly from her First point." With that concession made and considering our disposition of Bydalek's first point, we likewise deny Bydalek's second point.

*Bydalek Appeal Point III: Offset*

■ Bydalek's third point on appeal complains that the trial court "erred in concluding ... that [Plaintiffs] were entitled to receive $133,332 ... with interest at the rate of 20% per annum after the date of closing of the purchase agreement...." Without giving any attention to certain governing language of the judgment itself, Bydalek argues that since Plaintiffs breached their duty to retransfer their interest, they forfeited their right to the $133,332 plus interest. In addition, she argues that the trial court's conclusion of law suggests any damages suffered by Plaintiffs were the result of their own actions.

However, Bydalek fails to mention the trial court's entry of judgment which states:

"Because [P]laintiffs failed to provide or obtain financing for the [deal] on or before July 1, 1993, *[P]Plaintiffs interest under said contract immediately transferred to ... Bydalek* and each of them became entitled to recover from ... Bydalek the sum of $66,666.00, together with 20% interest from and after the date of the closing ...." (emphasis supplied).

By leaving unchallenged that part of the judgment emphasized by italics, Bydalek concedes the correctness of that adjudication. In light of Bydalek's concession that Plaintiffs' interest automatically transferred back to her, we cannot find that the trial court erred in ruling that Bydalek is obligated to repay Plaintiffs' investment under the terms of the Bydalek/Plaintiff contract (*see* Document II). Bydalek's third point is denied.

That part of the judgment awarding damages to Bobbi Bydalek against Roy Birdsong and Collyer Kelling for tortious interference of contract, including the award to Bydalek

for sums she paid to HCH Ozark Investors, Inc., Vacation World, Inc., Dwight Sprague, and BCPI, is reversed; that portion of the judgment against Roy Birdsong and Collyer Kelling awarding damages to Bobbi Bydalek for breach of contract is reversed; that portion of the judgment denying Roy Birdsong's and Collyer Kelling's claim against Bobbi Bydalek for breach of fiduciary duty is reversed and remanded. In all other respects, the judgment is affirmed.

PARRISH, P.J., and BARNEY, J., concur.

*APPENDIX A*

**DOCUMENT I**

REAL ESTATE PURCHASE AGREEMENT

. . . .

WHEREAS, Seller has contracted to purchase certain unimproved real property situated in Taney County, Missouri, which Seller anticipates to close on or before May 12, 1993,

and WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, such unimproved real property on the terms and conditions herein set forth.

. . . .

1. DEFINITIONS. As used in this Agreement, the following terms shall have the indicated meanings:

1.1 "Closing date"—shall mean on July 9, 1993, or on such other date as Buyer and Seller agree in writing.

. . . .

4. PURCHASE PRICE. The purchase price for the Property shall be Two Million Two Hundred Fifty Thousand Dollars (2,250,000.00).

4.1 Earnest Money Deposit. Upon the execution of this Agreement, Five Thousand Dollars ($5,000.00) (the "Initial Earnest Money Deposit") shall be delivered by Buyer to Seller. On or before 5:00 p.m., April 21, 1993, Buyer shall deliver the sum of Forty–Five Thousand Dollars ($45,-000.00) to Seller (the "Second Earnest

Money Deposit"). On or before 5:00 p.m., May 11, 1993, Buyer shall deliver to Seller an additional One Hundred Thousand Dollars ($100,000.00) (the "Third Earnest Money Deposit"). On or before 5:00 p.m., June 11, 1993, Buyer shall deliver to Seller an additional Fifty Thousand Dollars ($50,-000.00) (the "Fourth Earnest Money Deposit").

... **The Earnest Money Deposits shall be nonrefundable** ....

4.2 <u>Closing Payment</u>. On the Closing Date, the Seller shall retain the Earnest Money Deposits (including the investment interest) and Buyer shall pay to Seller the balance of the purchase price, after subtracting the Earnest Money Deposit...by cash or certified funds.

. . . .

6. ...Within thirty (30) days prior to the closing, the Seller shall have delivered to Buyer the following documents:

6.1 <u>Title Commitment</u>. A title commitment which shall show Seller to be the owner of good and marketable fee simple title to the Property.

. . . .

7.1 <u>Warranty Deed</u>. A duly executed and acknowledged Warranty Deed...conveying the Property to Buyer.

. . . .

11.1 ...In the event Buyer shall fail to make the payments required of Buyer pursuant to Paragraph 4.1 and 4.2, Buyer shall be in default; or if Buyer shall fail to perform any of Buyer's other obligations hereunder, except as excused by the Seller or by the Seller's default, the Seller shall make written demand on Buyer for such performance; and if Buyer fails to comply with such written demand within ten (10) days after receipt thereof Buyer shall be in default. Upon any default of Buyer, the Seller may terminate this Agreement and retain the Earnest Money Deposits and interest thereon, as full and complete liquidated damages for the failure of Buyer to perform its obligations hereunder.

. . . .

13.6. <u>Assignment</u>. Either party hereto may assign its rights under this Agreement without the prior written consent of the other party, however, such assignment shall not relieve the assignor from any liability under this Agreement as Buyer or Seller.

. . . .

13.9 <u>Cost of Litigation</u>. In the event any litigation to enforce this Agreement is commenced, the prevailing party shall be entitled to recover its cost, as well as all attorney fees which it incurs as the result of such action.

. . . .

13.11 <u>Confidentiality</u>. The parties agree that neither will publicize this Agreement or the terms contained herein to any third parties and each party shall endeavor to keep this Agreement confidential.

. . . .

**DOCUMENT II**

ASSIGNMENT OF REAL ESTATE PURCHASE AGREEMENT AND AGREEMENT FOR JOINT VENTURE

. . . .

BYDALEK presently is the owner of an agreement to purchase real estate in Branson Missouri comprised of three tracts....

BYDALEK hereby assigns to BIRDSONG and KELLING that BYDALEK shall be compensated as follows:

1. BIRDSONG and KELLING shall pay the sum of ONE HUNDRED THOUSAND DOLLARS ($100,000) to BYDALEK at the time of execution of this agreement to be paid on the purchase price on the underlying contract.

2. BYDALEK, BIRDSONG and KELLING agree to pay the sum of FIFTY THOUSAND DOLLARS ($50,000.00) on the contract on or before June 11, 1993.

3. BIRDSONG and KELLING agree to use diligent efforts to obtain financing to close the underlying purchase transaction on or before its scheduled closing date of July 9, 1993. In the event they are unable to do so,

they will notify BYDALEK of that inability on or before July 1, 1993, in which event the money advanced to BYDALEK shall be treated as a loan.

In that event, BIRDSONG and KELLING will immediately reassign their interest in said agreements to BYDALEK and BYDALEK shall execute a note that by its terms will repay the amounts paid on the contract by BIRDSONG, KELLING and BYDALEK at twenty percent (20%) interest, due August 1, 1993, secured by an interest in the real estate in question.

4. In the event BIRDSONG and KELLING are able to complete the transaction by providing financing for the closing, BYDALEK shall receive as additional consideration:

a. The sum of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) payable from the closing proceeds, if available, and if not available from the closing, then so much as is available from the closing proceeds up to said amount and the remainder from the proceeds made available from sales of portions of the real estate after all debt service has be (sic) completed;

b. The 3.84 acre tract free and clear after the financing has been paid.

The parties agree that as to all other net profit from development, sales, or leases of the real estate, the same shall be divided between the parties, one-third each.

The parties further agree that all decisions regarding use and development of the real estate shall be by majority vote.